[Cite as *Grieser v. Janis*, 2017-Ohio-8896.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Timothy Grieser et al., | : | |
| Plaintiffs-Appellants, | : | No. 17AP-3 |
| v. | : | (C.P.C. No. 12CV-13862) |
| Leonard R. Janis, D.P.M. et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on December 7, 2017

**On brief:** *David F. Rudwall*, for appellants. **Argued:** *David F. Rudwall*.

**On brief:** *Freund, Freeze & Arnold, Mark L. Schumacher, and Bartholomew T. Freeze*, for appellees. **Argued:** *Bartholomew T. Freeze*.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Plaintiffs-appellants, Timothy ("Timothy") and Meredith ("Meredith") Grieser (collectively "appellants"), husband and wife, appeal from a judgment of the Franklin County Court of Common Pleas in favor of defendants-appellees, Leonard R. Janis, D.P.M., and Total Foot and Ankle of Ohio, Inc. For the reasons that follow, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Timothy worked as a golf professional for the Reid Park Golf Course in Springfield, Ohio. He became a member of the Professional Golf Association in 2008. He married Meredith in 2000. Timothy testified that he began experiencing pain and

stiffness in his ankle in 2005 or 2006.  Timothy went to see his family physician, Alper Sarihan, M.D., regarding the ankle pain, and Dr. Sarihan ordered an MRI of Timothy's ankle.  According to Timothy, Jeffrey Gittins, D.O., reviewed the resulting images and concluded that Timothy had a lesion on his ankle, and he recommended the removal of the lesion arthroscopically.  Dr. Gittins told Timothy that he could "drill some holes into [his] bone where the bad bone used to be, and that that would bleed and form a material that would act as [his] cartilage in that joint area."  (Tr. Vol. 3 at 605-06.)  Timothy testified that the surgery "seemed like a good idea.  It was an opportunity to try to stay out in front of the issue that was starting." (Tr. Vol. 3 at 606.)

{¶ 3}  According to Timothy, the surgery "[s]eemed to work for a while," but by the end of the next golf season, the ankle became "more irritated again."  (Tr. Vol. 3 at 607.)  When Timothy went back to see Dr. Gittins, he recommended trying the surgery again.  Timothy elected to get a second opinion so he went to back to Dr. Sarihan.  As a result of his appointment with Dr. Sarihan, Timothy was referred to Dr. Janis at Total Foot and Ankle of Ohio, Inc.  Timothy remembers little about his first visit with Dr. Janis other than Dr. Janis using the terms "bone graft" and "good bone."  (Tr. Vol. 3 at 610.)  According to Timothy, when he went back to see Dr. Janis a second time, Dr. Janis described the surgical procedure he recommended as follows: "He would go in and open up the ankle joint in that area and take the cadaver bone and take a piece of it out of the cadaver and cut out the bad bone that I still had inside my joint and replace it."  (Tr. Vol. 3 at 611.)  Timothy did not recall Dr. Janis ever mentioning that he intended to work on Timothy's ligaments.

{¶ 4}  Dr. Janis subsequently performed a surgical procedure on Timothy's ankle.  Timothy testified that several months after the surgery, he experienced no improvement in either the range of motion or functionality of his ankle, even though he had faithfully undertaken a course of physical therapy.  Timothy testified that the pain and stiffness in his ankle worsened.

{¶ 5}  According to Timothy, Dr. Janis informed him that an MRI showed he now had a lesion on both sides of his ankle bone.  Timothy testified that Dr. Janis raised the subject of total ankle replacement surgery.  Timothy did not know that such a procedure could be performed on the ankle joint.  Timothy testified that Dr. Janis told him the total

ankle replacement "would alleviate the pain and give me more mobility, give me more of the lifestyle that I wanted to still lead at that age." (Tr. Vol. 3 at 618.) Dr. Janis also told Timothy that ankle fusion surgery was an option, but Timothy rejected that course of treatment because it would permanently limit his ankle flexibility and functionality.

{¶ 6} After reviewing the information regarding total ankle replacements on Dr. Janis's website and other websites, Timothy elected to have total ankle replacement surgery. In November 2009, Dr. Janis performed total ankle replacement surgery on Timothy's left ankle, using a Salto Talaris prosthesis. Timothy testified that after the surgery and following the completion of physical therapy, "it was almost like my ankle was locked in place and it hurt 100 percent of the day. * * * I thought I knew what pain was until I had this done. * * * I was taking eight Vicodin a day just to get through the day." (Tr. Vol. 3 at 621-22.) When Dr. Janis was subsequently unable to provide any relief for Timothy's increasing ankle pain and lack of flexibility, Timothy went back to Dr. Sarihan seeking a referral to another physician. Dr. Sarihan referred Timothy to Ethan Thompson, an orthopedic surgeon in Springfield, Ohio. Dr. Thompson took x-rays of Timothy's ankle and then referred him to Gregory Berlet, M.D. Dr. Berlet specialized in ankle surgery.

{¶ 7} After consulting with Dr. Berlet, Timothy agreed to undergo surgical revision of his ankle prosthesis. Dr. Berlet replaced the Salto Talaris prosthesis installed by Dr. Janis with a device known as an INBONE prosthesis. According to Timothy, after healing from the surgery performed by Dr. Berlet, "[t]he pain was not nearly as bad as it was. I stopped taking all of the big pain medications. The movement seemed to be a lot better, and when I moved, I didn't fall down or anything like that. I seemed to be stable." (Tr. Vol. 3 at 626.) Timothy testified that after the revision with Dr. Berlet, his ankle improved "in all aspects, going to the mall, walking down the mall, walking at the zoo with the kids or the family." (Tr. Vol. 3 at 627.)

{¶ 8} On July 15, 2011, appellants filed a complaint against Dr. Janis and Total Foot and Ankle of Ohio, Inc., alleging medical negligence, lack of informed consent, and loss of consortium. On November 3, 2011, the trial court dismissed the complaint, without prejudice, due to appellants' failure to file an affidavit of merit as required by Civ.R. 10(D)(2). (Compl. at 2.) On November 2, 2012, appellants refiled their complaint

against Dr. Janis and Total Foot and Ankle of Ohio, Inc., alleging the same claims. The affidavit of Jonathan J. Paley, M.D., is attached to the refiled complaint as an exhibit.

{¶ 9} On May 9, 2016, the parties tried the case to a jury. The jury found in favor of appellants and awarded damages against appellees of $140,000 for Timothy and $10,000 for Meredith. The parties submitted three interrogatories to the jury, including an interrogatory which asked the jurors to "specifically list the act(s) of negligence which you state Dr. Janis committed." (Jury Interrog. No. 2, filed May 19, 2016.) All seven jurors answered the interrogatory as follows: "Deviation from standard of care with malplacement of a total ankle replacement in a 33-year-old patient." (Jury Interrog. No. 2.)

{¶ 10} On May 24, 2016, the trial court issued a judgment entry in accordance with the jury verdict. On June 21, 2016, appellees filed a motion for judgment notwithstanding the verdict ("JNOV") pursuant to Civ.R. 54. Appellants filed a motion for prejudgment interest, pursuant to R.C. 1343.03(C), on that same date. On August 26, 2016, the trial court issued a decision granting appellees' motion for JNOV.

{¶ 11} On September 13, 2016, the trial court issued both a "Final Judgment Entry" in favor of appellees, and a judgment entry denying, as moot, appellants' motion for prejudgment interest. On October 11, 2016, appellants filed a motion for new trial pursuant to Civ.R. 59. Appellants' arguments in support of their motion for new trial focused on the trial testimony of Dr. Berlet. According to appellants, appellees' trial counsel and Dr. Berlet's own private counsel improperly influenced Dr. Berlet's trial testimony. More particularly, appellants alleged that these lawyers discouraged Dr. Berlet from providing an expert opinion at trial regarding the applicable standard of care, whether Dr. Janis breached that standard of care, and proximate cause. On December 2, 2016, the trial court issued a decision and entry denying appellants' motion for new trial.

{¶ 12} On January 1, 2017, appellants filed a notice of appeal to this court from the following trial court judgments: "the September 13, 2016 *Final Judgment Entry*, finalizing the Decision Granting Defendants' Motion For Judgment Notwithstanding the Verdict that was rendered on August 26, 2016 [and] the *Decision & Entry Denying Plaintiffs' Motion for New Trial*, filed * * * December 2, 2016." (Emphasis sic.) (Notice of Appeal at 1.)

## II.  ASSIGNMENT OF ERROR

{¶ 13} Appellants assign the following as trial court error:

The trial court reversed the jury verdict and granted defendant's motion for judgment notwithstanding the verdict.

## III. STANDARD OF REVIEW

{¶ 14} A motion for JNOV is governed by Civ.R. 50(B), which provides:

Whether or not a motion to direct a verdict has been made or overruled and not later than twenty-eight days after entry of judgment, a party may serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion. * * *

* * *

If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence.  If no verdict was returned the court may direct the entry of judgment or may order a new trial.

{¶ 15} The test applied by a trial court in ruling on a motion for JNOV is the same test to be applied on a motion for a directed verdict.  *Kenner v. Grant/Riverside Med. Care Found.*, 10th Dist. No. 15AP-982, 2017-Ohio-1349, ¶ 22, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 25; *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275 (1976).  "In reviewing a motion for JNOV, the evidence 'must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied.' "  *Kenner* at ¶ 22, quoting *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986), citing *Posin* at 275.  " 'Neither the weight of the evidence nor the credibility of the witnesses is proper consideration for the trial court.' "  *Kenner* at ¶ 22, quoting *Smith v. Superior Prod., LLC*, 10th Dist. No. 13AP-690, 2014-Ohio-1961, ¶ 11, citing *Posin* at 275.   "Thus, '[a] motion for judgment notwithstanding the verdict is used to determine only one issue: whether the evidence is totally insufficient to support the verdict.' "  *Kenner* at ¶ 22, quoting *Harper v. Lefkowitz,*

10th Dist. No. 09AP-1090, 2010-Ohio-6527, ¶ 8. "A ruling on a motion for JNOV is a question of law, reviewed de novo on appeal." *Kenner* at ¶ 22, quoting *Eastley* at ¶ 25 (stating that in reviewing such motions, "the court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward").

## IV.  LEGAL ANALYSIS

### A.  Appeal From the December 2, 2016 Judgment

{¶ 16} Though appellants' notice of appeal identifies the December 2, 2016 decision and judgment entry denying appellants' motion for new trial as one of the orders appealed from, appellants' merit brief does not include an assignment of error relating to the December 2, 2016 judgment. Pursuant to App.R. 12(A)(1)(b), an appellate court must "[d]etermine the appeal on its merits on the assignments of error set forth in the briefs under App.R. 16, the record on appeal under App.R. 9, and, unless waived, the oral argument under App.R. 21." Here, appellants' sole assignment of error makes no reference to trial court error regarding the denial of appellees' motion for new trial. Neither appellants' merit brief nor their reply brief make any argument regarding the trial court's ruling on their motion for new trial. Furthermore, appellees' counsel did not address the issue at oral argument. Accordingly, we find that appellants have abandoned the appeal from the December 2, 2016 judgment, and we shall not address the propriety of the trial court's ruling on appellees' motion for new trial in this appeal. *Jenkins v. State Farm Mut. Auto. Ins. Co.*, 10th Dist. No. 11AP-1074, 2013-Ohio-1142, ¶ 50, citing *Thompson v. Thompson*, 196 Ohio App.3d 764, 2011-Ohio-6286, ¶ 65 (10th Dist.) (because the appellant's assignments of error do not reference the trial court's denial of prejudgment interest and because the appellant did not raise the issue at oral argument, we will not address the issue in the appeal). *See also OCWEN Loan Servicing v. Prater*, 3d Dist. No. 9-12-23, 2012-Ohio-4879, ¶ 11 (appeal dismissed where sole assignment of error did not pertain to the judgment appealed from).

### B.  Appellants' Sole Assignment of Error

{¶ 17} In appellants' sole assignment of error, appellants contend that the trial court erred when it granted appellees' motion for JNOV as to appellants' claim of medical negligence.  In order to establish medical negligence, a plaintiff must show: (1) the

standard of care recognized by the medical specialty community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained. *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-999, 2013-Ohio-5140, ¶ 19, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130 (1976).

{¶ 18} "It is well settled in Ohio that in order to prevail in a medical malpractice claim, a plaintiff must demonstrate through expert testimony that, among other things, the treatment provided did not meet the prevailing standard of care." *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 102 (1992). "Proof of the recognized standards must necessarily be provided through expert testimony." *Bruni* at 131-32. "That expert testimony must explain what a physician of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances." *Stanley* at ¶ 19.

{¶ 19} In *Bruni*, the Supreme Court of Ohio established the legal standard for medical negligence as follows:

> In evaluating the conduct of a physician and surgeon charged with malpractice, the test is whether the physician, in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations.

*Id.* at 129-30.

{¶ 20} The foregoing standard is generally considered to be objective, rather than subjective, applying equally to all physicians under like or similar conditions or circumstances. *Bruni* at 134-35; *Berdyck v. Shinde*, 66 Ohio St.3d 573, 579 (1993); *Toth v. Oberlin Clinic, Inc.*, 9th Dist. No. 01CA007891, 2002-Ohio-2211, ¶ 46; *Riley v. Northeast Family Health Care*, 9th Dist. No. 17814 (Apr. 9, 1997). Failure to provide expert testimony establishing the recognized standards of care in the medical specialty

community is fatal to the presentation of a prima facie case of medical negligence. *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 38 (10th Dist.), citing *Bruni* at 130.

{¶ 21} In *Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St.3d 300, 2010-Ohio-1041, the Supreme Court set forth the rationale for the rule requiring expert testimony in medical negligence cases as follows:

> [C]ourts recognize that there may be a variety of causes for an injury in a medical malpractice case, and some procedures are so inherently risky that injuries may occur even when physicians are careful. "A physician is not a warrantor of cures. If the maxim, 'Res ipsa loquitur,' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.'" *Ewing v. Goode* (Cir.Ct., S.D.Ohio 1897), 78 F. 442, 443. Thus, a jury in a medical malpractice action would rarely be able to conclude, based on common experience alone, that the injury was one that did not ordinarily occur in the absence of negligence.

*Id.* at ¶ 22.

{¶ 22} As noted above, the jury found that Dr. Janis departed from the accepted standards of care in his treatment of Timothy by the "malplacement of a total ankle replacement in a 33-year-old patient." (Jury Interrog. No. 2.) In granting appellees' motion for JNOV, the trial court concluded that because appellants failed to present the testimony of a medical expert in order to establish the applicable standard of care, the evidence presented by appellants was insufficient to support the jury verdict in appellants' favor. The trial court further concluded that because appellants failed to present the testimony of a medical expert in order to establish an alleged deviation from the applicable standard of care by Dr. Janis proximately caused harm to appellants, the evidence presented by appellants was insufficient to support the jury verdict in their favor. We agree with the trial court's analysis and conclusions.

{¶ 23} Appellees called Stephen Conti, M.D., as their expert witness in this case. Dr. Conti testified that he is an orthopedic surgeon licensed to practice medicine in Pennsylvania and Ohio and that he has been board certified in orthopedic surgery since

1994.  He estimated that he has performed more than 1,000 total ankle replacement surgeries in his career and that he continues to perform such procedures on a weekly basis.  According to Dr. Conti, orthopedic surgeons and podiatrists have been performing total ankle replacement surgery for approximately 20 years, and the technology has continued to develop over that time.  Dr. Conti first began performing total ankle replacement surgery in the mid-90's, with a prosthetic device that he helped develop.  When that device went off the market in 2010, Dr. Conti began using other devices including the Salto Talaris prosthesis used by Dr. Janis in this case and the INBONE prosthesis used by Dr. Berlet.

{¶ 24} Prior to giving testimony in this matter, Dr. Conti reviewed the medical records relating to Timothy's treatment with Dr. Sarihan, Dr. Gittins, Dr. Janis, and Dr. Berlet, as well as the hospital records from the various surgical procedures performed on Timothy's ankle.  He also reviewed the deposition testimony of Timothy, Dr. Janis, Dr. Berlet, and physical therapist Mark Main.  Dr. Conti testified that in 2005 and 2006, Timothy suffered from ostechondritis diseccans ("OCD lesion") affecting the talus bone, which is located in the lower leg below the tibia.  Dr. Conti stated that the ankle is located between the tibia and the talus.  Dr. Conti described Timothy's OCD lesion as a small area of dead bone at the top of the talus, about the size of a pencil eraser.

{¶ 25} Dr. Conti testified that curing the lesion was the goal of the surgical procedures performed by Dr. Gittins, as well as the first surgery performed by Dr. Janis. According to Dr. Conti, after the curative surgical procedures had failed, Timothy had the following options: (1) do nothing and live with the pain and stiffness in his ankle, (2) total ankle replacement surgery, and (3) ankle fusion surgery.  Dr. Conti testified that it was reasonable for Dr. Janis to discuss the possibility of total ankle replacement with Timothy after the curative surgical procedures had failed.

{¶ 26} Dr. Conti described total ankle replacement surgery using the Salto Talaris prosthesis.  He stated that device includes a metal component which is attached to the tibia, a component that is attached to the talus, with a prosthetic ankle joint between the two, consisting of both metal and plastic parts.  Dr. Conti testified that the surgeon visually determines where to drill into the tibia to attach the Salto Talaris prosthesis.  The surgeon then makes the incision and drills into the tibia with the aid of a block and jig.

According to Dr. Conti, the instruments used by surgeons when installing a total ankle replacement are still "crude" when compared to the instruments used in hip or knee replacement procedures, "but this is standard of what we are currently using." (Tr. Vol. 3 at 475.) He also stated that the medical community is "still learning, * * * still kind of in our infancy, and some things go well and some things go poorly." (Tr. Vol. 3 at 476.) Dr. Conti testified "patients that have [a] seemingly well done total ankle, but still hurt * * * on the inside and the outside parts of the ankle." (Tr. Vol. 3 at 476-77.) According to Dr. Conti, the range of acceptable error in regard to the positioning of the Salto Talaris prosthesis as it is attached to the tibia is one to three millimeters. Dr. Conti testified that x-rays taken of Timothy's ankle following the total ankle replacement surgery performed by Dr. Janis do not show a prosthetic ankle joint that is "mechanically blocked because it has been put in too high as compared to the native joint line." (Tr. Vol. 3 at 488.)

{¶ 27} On direct examination, Dr. Conti further opined as follows:

> Q. Just to finish up, do you have an opinion whether Dr. Janis in any fashion departed from accepted standards of care in his care and treatment of his patient, Timothy Grieser?
>
> A. So my opinion is he did not deviate from any accepted standards of care. In fact, he provided [Timothy] with exceptional care.
>
> Q. And do you have an opinion, again based on reasonable medical certainty, whether any action or inaction of Dr. Leonard Janis directly and proximately caused harm to his patient, Timothy Grieser?
>
> A. My opinion is he did not cause harm to Mr. Grieser.

(Tr. Vol. 3 at 501.)[1]

---

[1] Dr. Janis testified as follows:

> Q. All right. Do you believe that you departed from accepted standards of care in your treatment of [Timothy]?
>
> A. Not at all.

(Tr. Vol. 4 at 806.)

{¶ 28} Appellants concede that Ohio law required them to produce expert medical testimony in order to support a jury verdict in their favor.  Appellants do not claim that the standard of care in the orthopedic surgical community applicable to the implantation procedure for the Salto Talaris prosthesis is a matter within the common knowledge of laypersons.  Appellants argue, however, that the testimony of Dr. Berlet, when construed in their favor, provides sufficient support for the jury's determination that Dr. Janis breached the standard of care.  We disagree.

{¶ 29} Dr. Berlet testified that he is licensed to practice medicine in Ohio and that he achieved board certification in orthopedic surgery in 1994.  Dr. Berlet indicated that he was testifying in the trial of this matter as Timothy's treating physician, not as a paid expert witness for appellants.  Dr. Berlet also acknowledged at trial that he did not review the medical records produced by Dr. Janis or those produced by physical therapist Mark Main prior to his giving testimony in this matter.

{¶ 30} Dr. Berlet's primary criticism of Dr. Janis's treatment of Timothy was that Dr. Janis attached the tibial section of the Salto Talaris prosthesis too high on the tibia, causing an impingement of the prosthetic ankle joint and resulting in stiffness and pain in the ankle.  In Dr. Berlet's notes concerning his initial treatment of Timothy's ankle, Dr. Berlet indicated that x-rays taken at his direction showed that the Salto Talaris prosthesis was "malpositioned."  (Tr. Vol. 2 at 375.)  Dr. Berlet acknowledged, however, that whether the surgeon is using the Salto Talaris prosthesis or the INBONE prosthesis, "the most complicated part of this operation is lining it up and deciding where to do the bone cut."  (Tr. Vol. 2 at 359.)  He also acknowledged on cross-examination that an operative report indicates that adequate range of motion in the prosthetic ankle joint was confirmed by anatomic fluoroscopy immediately following the installation of the Salto Talaris prosthesis by Dr. Janis.  Though Dr. Berlet stated that he "would tend to disagree" with the operative note, he acknowledged that the development of scar tissue post-operatively could affect range of motion and that he "saw this patient some six to eight months later, so that there is a lot of things that can happen in the meantime."  (Tr. Vol. 2 at 382-83.)  On direct examination, Dr. Berlet never offered testimony in the form of an opinion regarding the applicable standard of care in the medical specialty community, nor did Dr.

Berlet testify that, in his opinion, Dr. Janis deviated from that standard of care in his treatment of Timothy.

{¶ 31} Appellants maintain that Dr. Berlet's testimony on redirect examination regarding a treatment note he authored following his first office visit with Timothy provides the expert opinion necessary to sustain the jury verdict. On redirect examination, Dr. Berlet testified as follows:

> Q. And finally, in No. 4 of your impression part of the note, you described the persistent pain, and that was a problem that you had to deal with, correct?
>
> A. Yes.
>
> Q. Thank you. And in the plan portion of that note, you wrote: "Mr. Grieser and I had a very good conversation about what it means to put a joint replacement in a 33-year-old." Do you remember writing that?
>
> A. Yes.
>
> Q. "It is certainly not the standard of care, although it can be done. It has to be with a very clear recognition from the client that this will not last their life and ultimately will require some revisions. It seems that this conversation really had not happened with Dr. Janis." Do you remember writing that?
>
> A. So the context is important. The standard I am referring to is the one we discussed earlier. If we are in a room of orthopedic surgeons discussing this case, it would be highly unlikely that that would be the option recommended.
>
> Q. And that is your opinion, and not merely to a probability, but based upon all of your skill and training and knowledge and experience to a reasonable certainty, correct?
>
> A. Yes.

(Tr. Vol. 2 at 376-77.)

{¶ 32} Dr. Berlet also referred to Dr. Janis's decision to perform a total ankle replacement on an active 33-year-old patient as, "in an orthopedic context, * * * unconventional." (Tr. Vol. 2 at 347.)

{¶ 33} As previously noted, the parties submitted three interrogatories to the jury, including an interrogatory which asked the jurors to "specifically list the act(s) of negligence which you state Dr. Janis committed." (Jury Interrog. No. 2.) All seven jurors answered the interrogatory as follows: "Deviation from standard of care with malplacement of a total ankle replacement in a 33-year-old patient." (Jury Interrog. No. 2.) "The purpose of jury interrogatories is twofold." *Reeves* at ¶ 30, citing *Hamm v. Smith*, 6th Dist. No. E-98-026 (Dec. 18, 1998). " 'The essential purpose to be served by [jury] interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial.' " *Reeves* at ¶ 30, quoting *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.*, 28 Ohio St.3d 333, 336-37 (1986), citing *Davison v. Flowers*, 123 Ohio St. 89 (1930). "Jury interrogatories also test the jury's factual determinations and express the jury's true intentions." *Reeves* at ¶ 30, citing *Hamm*, citing *Phillips v. Dayton Power & Light Co.*, 111 Ohio App.3d 433, 446 (2d Dist.1996). "The Supreme Court of Ohio stated that 'the answering of [jury] interrogatories is even more important than the general verdict.' " *Reeves* at ¶ 30, quoting *Aetna Cas. & Surety Co. v. Niemiec*, 172 Ohio St. 53, 55 (1961).

{¶ 34} In our view, the opinion testimony relied on by appellants does not support the jury finding of a "[d]eviation from standard of care with malplacement of a total ankle replacement in a 33-year-old patient." (Jury Interrog. No. 2.) Even when viewed in a light most favorable to appellants, Dr. Berlet's testimony cannot reasonably be construed as an opinion regarding the standard of care in the field of orthopedic surgery with regard to the placement of the Salto Talaris prosthesis during total ankle replacement surgery. Though Dr. Berlet is clearly qualified to express an opinion in this regard, absent his expression of such an opinion, the jury was left to speculate whether a podiatrist of ordinary skill, care, and diligence in the field of orthopedic ankle replacement surgery would not have positioned the Salto Talaris prosthesis as Dr. Janis did. Dr. Berlet's subjective opinion that the Salto Talaris prosthesis was malpositioned on the tibia does not equate to an opinion regarding the applicable standard of care in the medical specialty community. Similarly, we disagree with appellants' claim that Dr. Berlet's testimony supports a finding that Dr. Janis breached the standard of care by performing total ankle

replacement surgery on a 33-year-old patient, Dr. Berlet's testimony was not the basis on which the jury found Dr. Janis had breached this standard of care. Moreover, there is no dispute that following the total ankle replacement surgery performed by Dr. Janis, Timothy elected to undergo a second total ankle replacement with Dr. Berlet, rather than opting for ankle fusion surgery. Accordingly, we find that the above-cited testimony from Dr. Berlet, when construed in appellants' favor, does not satisfy appellants' burden of producing an expert opinion regarding the standard of care and does not successfully rebut the arguments in favor of granting judgment notwithstanding the verdict. This being the case, the record does not contain substantial, competent evidence in support of the jury verdict.

{¶ 35} Even if we were to conclude that Dr. Berlet's trial testimony qualifies as an expert opinion regarding an applicable standard of care, when appellees' trial counsel asked Dr. Berlet whether he was offering an expert medical opinion regarding standard of care, the following exchange took place:

Q. All right. So you are not here to testify before this jury as to accepted standards of care in the treatment of this patient; is that right?

A. I am not.

Q. All right. You make no opinion that Dr. Janis violated any standard of care in his care and treatment of this patient?

A. I do not.

Q. And that is your opinion to a reasonable medical certainty?

A. It is.

Q. Anything to the contrary notwithstanding?

A. I am not sure what you mean by that last statement.

Q. There is nothing else you have said should be interpreted as standard of care testimony?

A. I am not providing standard of care testimony.

(Tr. Vol. 2 at 378.)

{¶ 36} "Once an expert properly states his professional opinion to a properly formed question as to 'probability,' he * * * has established a prima facie case as a matter of law."  *Heath v. Teich*, 10th Dist. No. 03AP-1100, 2004-Ohio-3389, ¶ 14, quoting *Galletti v. Burns Internatl.*, 74 Ohio App.3d 680, 684 (11th Dist.1991).  Consequently, in reviewing a trial court's decision to grant a motion for a directed verdict, appellate courts, including this court, have concluded that the erosion of an expert witness's testimony by effective cross-examination does not warrant the granting of such a motion unless the expert either contradicts or recants his prior testimony.  *Heath* at ¶ 14.  *See also Lanzone v. Zart*, 11th Dist. No. 2007-L-073, 2008-Ohio-1496, ¶ 58.  " 'Erosion of [an expert] opinion due to effective cross-examination does not negate that opinion; rather it only goes to weight and credibility.' "  *Heath* at ¶ 14, quoting *Galletti* at 684.  " 'The exception would be when the expert actually recants the opinion on cross.' "  *Lanzone* at ¶ 58, quoting *Celmer v. Rodgers*, 11th Dist. No. 2004-T-0074, 2005-Ohio-7054, ¶ 35.  "[T]he party moving for a directed verdict must show that the testimony was resolved in its favor by direct contradiction, negation, or recantation of the testimony given by the witness on direct examination."  *Heath* at ¶ 14, citing *Nichols v. Hanzel*, 110 Ohio App.3d 591, 602 (4th Dist.1996).  To "recant" is to "[t]o withdraw or renounce (prior statements or testimony) formally or publicly."  *Black's Law Dictionary* 1459 (10th Ed.2014).  To "negate" is "1. To deny.  2. To nullify; to render ineffective."  *Black's* at 1195.

{¶ 37} In this instance, rather than simply contradicting or retreating from a prior opinion he had given regarding the standard of care, Dr. Berlet insisted that he had not offered any such opinion during his direct examination and that it was not his intention to do so.  The conclusion to be drawn from Dr. Berlet's testimony on cross-examination is that Dr. Berlet negated and/or recanted any prior opinion he may have rendered regarding the recognized standard of care applicable to the care and treatment of Timothy.  Thus, to the extent that Dr. Berlet's testimony on direct examination could be construed as an expression of his expert opinion regarding the applicable standard of care and Dr. Janis's breach thereof, Dr. Berlet expressly recanted any such opinion on cross-examination.  In our view, Dr. Berlet's unequivocal testimony on cross-examination

effectively negated any standard of care opinion he may have provided during his direct examination.

{¶ 38} Appellants counter that Dr. Berlet "affirmed on re-direct" opinions he had given during his direct examination. (Appellants' Reply Brief at 10.) Appellants cite the following testimony as evidence that Dr. Berlet did render expert opinion testimony regarding the standard of care:

> Q. [Y]our testimony here today is clearly as an expert because you are not a lay person, it is an expert that possesses higher knowledge, skill, training and expertise, and you know that the jury will accept your testimony as an expert?
>
> A. Yes.
>
> Q. Okay. And it is in that spirit that you are here today to talk about what you know and about your observations and opinions that have been recorded in the records?
>
> A. Yes.
>
> [Appellant's Counsel]: Thank you.

(Tr. Vol. 2 at 402.)

{¶ 39} In our view, the testimony on which appellants rely is merely Dr. Berlet's acknowledgment that he possesses the knowledge, skill, training, and experience in orthopedic surgery necessary to qualify him as an expert. Appellees' argument, however, is not that Dr. Berlet lacks the necessary qualifications to offer an expert opinion regarding the applicable standard of care but, rather, that Dr. Berlet did not offer any such opinion in this case. Nothing in his redirect examination rehabilitates him after he stated on cross-examination, "I am not providing standard of care testimony." (Tr. Vol. 2 at 378.) We agree with appellees. Contrary to appellants' assertion, it is not reasonable to construe Dr. Berlet's testimony on redirect as an affirmation of a previously expressed opinion regarding the applicable standard of care, even if he had offered such an opinion.

{¶ 40} The trial court found, alternatively, that appellants did not produce expert testimony to support the jury determination that a failure by Dr. Janis to meet the applicable standard of care in his treatment of Timothy proximately caused appellants' harm. When appellees' trial counsel asked Dr. Berlet whether he had an opinion

regarding the cause of Timothy's loss of flexibility in his ankle joint and the ankle pain experienced by Timothy following his treatment with Dr. Janis, Dr. Berlet gave the following testimony:

> Q. * * * Just a couple of questions. At deposition you testified that you make no opinion as to the cause of this patient's ankle pain, either medial or lateral, either side of the foot?
>
> A. Maybe you can put a time context to that statement.
>
> Q. I can show you the testimony, in fact.
>
> A. Sure.
>
> Q. I asked you if you would make an opinion about the reason for his lateral pain, meaning pain on the outside of his foot, and the answer was, "No."
>
> "Do you make any opinion about the reason for any of this pain, whether lateral or medial?" And the answer was, "No."
>
> "He went into the situation with pain?" And the answer: "Yes."
>
> "His pain complaints go back to 2005 or so, don't they?"
>
> "Yes. The relevant part is he is able to continue to function."
>
> Do you agree with that testimony today, Doctor?
>
> A. I do. I also bring up my earlier testimony is that I concluded that his pain was mechanical pain.
>
> Q. Have you ever seen the records of Dr. Janis or the physical therapist up to whatever bits you have been shown today, correct?
>
> A. No.

(Tr. Vol. 2 at 379-80.)

{¶ 41} "In medical malpractice cases, the general rule is that the plaintiff must prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence." *Stamper v.*

*Univ. of Cincinnati Hosp.*, 10th Dist. No. 99AP-1157 (Aug. 31, 2000), quoting *Hitch v. Dept. of Mental Health*, 114 Ohio App.3d 229, 240 (10th Dist.1996). " 'Probably' is defined as 'more likely than not' or greater than fifty percent chance." *Id.*, quoting *Miller v. Paulson*, 97 Ohio App.3d 217, 222 (10th Dist.1994).

{¶ 42} The only expert medical testimony in the record as to proximate cause of the pain and stiffness experienced by Timothy following the total ankle replacement surgery performed by Dr. Janis was that of Dr. Conti. Given Dr. Berlet's acknowledgment that Timothy had experienced stiffness and pain in his ankle joint both prior to and following his treatment with Dr. Janis, and Dr. Berlet's admission that patients may still experience ankle pain even though an ankle prosthesis is properly positioned, it was imperative for appellants to present the testimony of a medical expert to support appellants' claim that Timothy's complaints of ankle pain and stiffness following the surgical procedure performed by Dr. Janis were caused, in whole or in part, by Dr. Janis's failure to meet the applicable standard of care. *See* S*tamper*; *Hitch*. Though Dr. Berlet testified that the pain experienced by Timothy following the total ankle replacement surgery with Dr. Janis was "mechanical pain," he did not testify to a reasonable degree of medical probability that the pain and stiffness of Timothy's ankle were caused by the negligence of Dr. Janis. (Tr. Vol. 2 at 379.)

{¶ 43} For the foregoing reasons, we find that the jury verdict in appellants' favor was not supported by the evidence. Accordingly, we hold that the trial court did not err when it granted appellees' motion for JNOV and entered judgment in favor of appellees. Appellants' sole assignment of error is overruled.

## V. CONCLUSION

{¶ 44} For the foregoing reasons, appellants' sole assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BROWN and BRUNNER, JJ., concur.

_____