[Cite as *Santamaria v. Cleveland Clinic Found.*, 2023-Ohio-3362.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

NATHAN SANTAMARIA,                         :

    Plaintiff-Appellant,           :

                              No. 112216

    v.                             :

CLEVELAND CLINIC FOUNDATION,   :
ET AL.,

                              :

    Defendants-Appellees.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 21, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-19-922007

---

### *Appearances:*

Thomas J. Misny, *for appellant*.

Tucker Ellis LLP, Elisabeth C. Arko, Susan M. Audey,
Edward E. Taber, and Jeffrey M. Whitesell, *for appellees*.

SEAN C. GALLAGHER, J.:

{¶ 1} Nathan Santamaria appeals the trial court's decision denying his motion for directed verdict upon his medical negligence claim, made at the close of evidence in a jury trial that resulted in a verdict in favor of Cleveland Clinic Foundation and Brian T. Canterbury, M.D. We affirm.

{¶ 2} Dr. Canterbury, starting toward the end of 2017, treated Santamaria for urological issues. Santamaria was approximately 67 years old at the time and suffered diabetes, high blood pressure, and several lower urinary-tract conditions including nocturia (the need to frequently urinate at night) and incomplete bladder emptying. Santamaria experienced pain and trouble urinating in general. The official diagnosis was benign prostatic hyperplasia ("BPH"), a common condition in older men in which the prostrate is enlarged and obstructs the flow of urine out of the bladder. As the prostate gland becomes enlarged, it puts pressure on the prostatic urethra, which is the portion of the urethra that traverses the prostate gland, restricting the flow of urine. Dr. Canterbury discovered a preexisting condition at the time of the initial diagnosis, described as an extremely rare condition. Santamaria's bladder had become displaced and protruded into his scrotum. The herniation needed to be repaired before the enlarged prostrate issue could be addressed.

{¶ 3} After the hernia surgery, sometime in mid-2018, Dr. Canterbury began discussing the next steps to treating the enlarged prostate. He recommended a transurethral resection of the prostrate; commonly referred to as a "TURP" for short. There are various tools used to conduct a TURP procedure, and Dr. Canterbury recommended a "button" TURP, designated by his tool of choice. There is no dispute that the button TURP is a generally recognized procedure to treat BPH. The purpose of the TURP procedure, regardless of the tool, is to remove or resect enough prostate tissue to open the urethra and enable a freer evacuation of urine. The

procedure was delayed until near the end of 2018 to accommodate Santamaria's schedule.

{¶ 4} In executing the TURP procedure, there is no specific amount of prostatic tissue to be removed; the amount removed is case specific. In general terms, according to all testifying experts in this case, taking too little may result in the BPH symptoms not being abated, while taking too much could result in permanent incontinence (the inability to control the release of bodily fluids). The ultimate goal of the procedure is to take just enough prostatic material to permit the opening of the urethra. It is undisputed that Dr. Canterbury took a limited approach in performing the TURP and removed a small amount of prostatic tissue around the bladder neck, rather than removing tissue along a larger portion of the urethra. In his professional opinion, that was sufficient to relieve Santamaria's symptoms at the time the procedure was performed. Dr. Canterbury took this approach based in part on Santamaria's other conditions and based on his knowledge of the hernia repair that had been conducted earlier that year. There is a dispute as to whether Santamaria discussed that approach with Dr. Canterbury before the procedure.

{¶ 5} After the procedure, however, Santamaria suffered known complications. He developed urinary tract infections and blood clots, which required the use of blood thinner medication.[1] Around the same time, Santamaria

---

[1] Initially, Santamaria and his retained expert included a claim based on the blood clots, claiming that Dr. Canterbury had not utilized the necessary mitigation techniques to prevent the blood clots from forming during the TURP procedure. After his expert was provided a more thorough set of Santamaria's medical records, that claim was abandoned.

began experiencing kidney stones, which also complicated his recovery. None of those complications are alleged to have been caused by Dr. Canterbury's performance of the TURP procedure.

{¶ 6} There is conflicting evidence as to the efficacy of the procedure performed. The medical notes from Santamaria's follow-up appointments with Dr. Canterbury's office indicate that Santamaria believed he was urinating more freely, but Santamaria sought a second opinion from two other urologists based on his belief that symptoms were continuing and because he was regularly relying on a catheter to void his bladder at home. The evidence conflicted on whether Dr. Canterbury was made aware of Santamaria's self-catheterization, and there is some suggestion that Santamaria did not initially mention the self-catheterization to his new treating physicians after he sought the second opinion.

{¶ 7} A second TURP procedure was recommended, but Santamaria could not undergo the procedure until his treatment for the blood clots and kidney stones had ended. Ultimately, approximately nine months following Dr. Canterbury's procedure, Santamaria underwent a second TURP procedure in which the performing urologist removed additional prostatic tissue that resulted in a complete remediation of Santamaria's urological complaints at that time.

{¶ 8} According to Santamaria, Dr. Canterbury breached the requisite standard of care by not taking enough tissue during the TURP procedure he performed. There was a second claim for fraud advanced against Dr. Canterbury and the Cleveland Clinic based on the surgical notes completed after the procedure,

but that claim was included within the allegations of medical negligence and was not presented as a stand-alone claim. After completing the TURP procedure, Dr. Canterbury indicated in the surgical notes that he took more material than he had actually removed; in other words, he incorrectly described the scope of the procedure performed. The notes, which were written by a surgical resident assisting Dr. Canterbury, were based on a recognized template describing the generic version of the button TURP procedure that had not been modified to present an accurate representation of the procedure performed. Dr. Canterbury signed the record without catching the mistake but admitted the recounting of the procedure in the surgical notes was not accurate.

{¶ 9} All the experts in the case agreed that Santamaria's subsequent care was not affected by this error, and Santamaria had difficulty at trial presenting actual damages stemming from the medical reporting issue. The five-day jury trial was largely a case of dueling experts opining on the breach of the standard of care as it related to the medical claim.[2]

{¶ 10} According to Jamie Wright, M.D., the chief of urology at Johns Hopkins University, in speaking on whether Dr. Canterbury breached the recognized standard of care in performing the TURP, it is "difficult during those

---

[2] Inasmuch as Santamaria relies on one of his treating urologists' "opinions" regarding the efficacy of Dr. Canterbury's procedure, that reliance is misplaced. The treating urologists providing treatment after Dr. Canterbury were not qualified as experts to opine on the standard of care. *See Vaught v. Cleveland Clinic Found.,* 8th Dist. Cuyahoga No. 79026, 2001 Ohio App. LEXIS 3958, 8 (Sept. 6, 2001). We need not consider their testimony in regard to establishing the breach of the standard of care.

procedures to know exactly how much is enough in terms of removal of that issue so there's a bit of adjustment involved and typically * * * when you can see a channel or a path through the prostatic urethra, there's a point at which you say that looks like it will do the job." Tr. 836:19-24. "And while there's science involved," according to Dr. Wright, "there's also a little bit of art involved and that is, you know, often requires some judgment, experience. We don't always get it 100 percent right. But the overarching goal in essence is to first do no harm." Tr. 837:19-25. Dr. Wright testified to finding no correlation between the amount of tissue removed and abatement of symptoms from BPH. After reviewing the medical record, Dr. Wright concluded that Dr. Canterbury resected the bladder neck and generally speaking, that is recognized as being "perfectly adequate to relieve symptoms," although he conceded that "sometimes it doesn't quite meet the bar" either. Tr. 881:20-24. Dr. Wright nonetheless concluded that Dr. Canterbury's approach met the minimum standard of care for performing the button TURP procedure.

{¶ 11} Richard Babayan, M.D., the past urology chair for Boston University and the former President of the American Urological Association, agreed with Dr. Wright's opinion. According to Dr. Babayan, Dr. Canterbury exercised reasonable judgment in taking the conservative approach in the amount of biological material being removed to minimize the risk of permanent incontinence. Tr. 781:22-782:5. Moreover, Dr. Babayan testified that in 27 percent of cases involving the TURP procedure, the patient needs to undergo a second TURP procedure to remove additional tissue.

{¶ 12} Importantly, both Dr. Babayan and Dr. Wright divorced the ultimate efficacy of the procedure from the standard of care in performing it.

{¶ 13} Peter Steinberg, M.D., an assistant professor in urology at Harvard Medical School, disagreed with the defense's experts—although he conceded both were renowned and well-respected experts in the urology field. According to Dr. Steinberg, "[T]the standard of care is to remove the appropriate amount of tissue to relieve the obstruction so the urine will flow out at the end of the procedure." Tr. 927:3-7. Thus, under this Goldilocks-esque standard of care, a treating urologist must "A, select a surgical technique that will allow you to resect all of the obstructing prostatic tissue and then B, when you do that surgery, to remove all of the obstructive tissue." Tr. 359:17-20. But, taking too little or too much can lead to breaching the standard of care. Dr. Canterbury, according to Dr. Steinberg, breached the standard of care: "[h]e did not (A), utilize a technique to optimally resect the prostatic tissue and (B), with the technique he chose he did not thoroughly resect the obstructive prostatic tissue" because Santamaria's symptoms were not relieved and he was required to use a catheter to drain his bladder following the initial procedure. Tr. 383:3-6. In simple terms, Dr. Steinberg claimed that Dr. Canterbury did not remove enough prostatic tissue to remediate Santamaria's symptoms; and accordingly, he breached the standard of care for performing the button TURP, a procedure Dr. Steinberg does not perform, nor one that is even performed at his hospital.

**{¶ 14}** Upon that evidence, Santamaria filed a motion for directed verdict claiming there was "irrefutable" evidence that Dr. Canterbury breached the standard of care based on the totality of the evidence presented at trial. The trial court viewed the evidence differently. Based on the disparate testimony given by each side's respective experts, the court concluded that there was an issue of fact as to whether Dr. Canterbury breached the standard of care requiring the jury's consideration.

**{¶ 15}** The jury considered that evidence and rendered a verdict in favor of Dr. Canterbury and the Cleveland Clinic upon the sole question of whether Santamaria proved "by a preponderance of the evidence that Dr. Canterbury was negligent in the care and treatment he provided" Santamaria. This timely appeal followed, in which Santamaria advances a single assignment of error claiming the trial court erred in denying his motion for a directed verdict. There is no merit to his appellate argument.

**{¶ 16}** Appellate review of the trial court's decision to grant or deny a motion for a directed verdict under Civ.R. 50(A)(4) is a question of law, which is reviewed de novo. *Pietrangelo v. Hudson*, 8th Dist. Cuyahoga No. 111805, 2023-Ohio-820, ¶ 28, citing *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4. After construing the evidence most strongly in favor of the party against whom the motion is directed, a motion for directed verdict can only be granted when "reasonable minds could come to but one conclusion upon the evidence submitted." *Ruta v. Breckenridge-Remy Co.*, 69 Ohio

St.2d 66, 69, 430 N.E.2d 935 (1982), citing *Hamden Lodge v. Ohio Fuel Gas Co.*, 127 Ohio St. 469, 189 N.E. 246 (1934).

{¶ 17} "In order to establish medical malpractice, a plaintiff must show: (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained." *Stanley v. The Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 12AP-999, 2013-Ohio-5140, ¶ 19, citing *Bruni v. Tatsumi,* 46 Ohio St.2d 127, 130, 346 N.E.2d 673 (1976). "Ordinarily, the appropriate standard of care must be demonstrated by expert testimony. That expert testimony must explain what a physician of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances." *Gabriel v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 14AP-870, 2015-Ohio-2661, ¶ 13. As long as there is expert testimony minimally establishing opinions as to the breach or non-breach of the standard of care in a medical claim action, the parties are entitled to the jury's resolution of the claims. *See Yung v. UC Health*, LLC, 1st Dist. Hamilton No. C-220386, 2023-Ohio-789, ¶ 20.

{¶ 18} In his motion for directed verdict, and reiterated again in this appeal, Santamaria claims in pertinent part that "the determinative issue about the medical evidence in this case" is whether Dr. Canterbury adequately resected enough tissue from Santamaria's prostate to relieve the urinary obstruction. According to Santamaria, answering that question in the negative requires a conclusion that

Dr. Canterbury breached the standard of care in performing the button TURP procedure and that entitles him to a judgment upon liability.

{¶ 19} Although Dr. Steinberg offered testimony in support of Santamaria's conclusion, that cannot be accepted as the proper inquiry as a matter of law. Medical negligence claims do not hinge solely on the efficacy of the treatment or procedure. Santamaria has provided no legal analysis to support his broad conclusion. *See* App.R. 16(A)(7).

{¶ 20} The standard of care, as the jury was charged in this case, is whether a reasonable urologist in the same circumstances as Dr. Canterbury would consider his conduct in performing the procedure to be reasonable or not. Tr. 1031:10-1033:8. The ultimate efficacy of the procedure is not the overriding guidepost; rather it is one factor to consider in deciding whether the physician reasonably exercised his professional judgment in the given circumstance in accordance with the standards of the particular specialty.

{¶ 21} Notwithstanding this observation, the focus of Santamaria's argument is on the competing evidence presented by all the witnesses at trial. Inherently, that focus is misplaced in terms of seeking a directed verdict. Santamaria's motion for a directed verdict attempted to draw from his cross-examination of the defendants' expert witnesses, claiming that the cross-examination demonstrated the absence of disputed issues on the issue of whether Dr. Canterbury breached the standard of care.

{¶ 22} In the present case, Dr. Wright and Dr. Babayan testified, within a reasonable degree of medical probability, that Dr. Canterbury did not deviate from the applicable standard of care by resecting the prostate at the bladder neck. When reviewing a motion for a directed verdict in a medical negligence action, "'[o]nce an expert properly states [their] professional opinion to a properly formed question as to "probability," [they] * * * have established a prima facie case as a matter of law.'" (Omission sic.) *Grieser v. Janis*, 2017-Ohio-8896, 100 N.E.3d 1176, ¶ 36 (10th Dist.), quoting *Heath v. Teich*, 10th Dist. Franklin No. 03AP-1100, 2004-Ohio-3389, ¶ 14, quoting *Galletti v. Burns Internatl.*, 74 Ohio App.3d 680, 684, 600 N.E.2d 294 (11th Dist.1991). Limiting the impact of an expert's opinion through cross-examination does not obviate the opinion elicited on direct. *Id.* The cross-examination addresses the weight and credibility of that expert's opinion, not its substantive value. *Id.*

{¶ 23} The sole exception to this legal dogma relates to an expert recanting or negating their prior opinion on cross-examination. *Id.* "[T]he party moving for a directed verdict must show that the testimony was resolved in its favor by direct contradiction, negation, or recantation of the testimony given by the witness on direct examination.'" *Id.*, quoting *Heath* at ¶ 14, citing *Nichols v. Hanzel*, 110 Ohio App.3d 591, 602, 674 N.E.2d 1237 (4th Dist.1996) (using *Black's Law Dictionary* 1459 (10th Ed.2014) to define "recant" as "'[t]o withdraw or renounce (prior statements or testimony) formally or publicly'" and to "negate" is "'1. To deny. 2. To nullify; to render ineffective'"). There is no dispute that neither Dr. Wright nor

Dr. Babayan recanted or otherwise negated or directly contradicted their opinion as to Dr. Canterbury not breaching the standard of care during Santamaria's cross-examination. Santamaria's argument is premised on his belief that Dr. Canterbury's decision to resect the prostatic tissue at the bladder neck was in and of itself negligent. Both Dr. Wright and Dr. Babayan disagreed with that conclusion.

{¶ 24} As a result, there is disputed evidence as to whether Dr. Canterbury breached the standard of care in performing the button TURP procedure in the manner in which it was completed based on Dr. Wright's and Dr. Babayan's conclusions. Dr. Steinberg disagreed with their assessment. The jury was required to weigh the evidence and determine which side's experts were more credible on the standard-of-care question. It is well settled that a motion for directed verdict "does not test the weight of the evidence or the credibility of the witnesses." *Krofta v. Stallard*, 8th Dist. Cuyahoga No. 85369, 2005-Ohio-3720, ¶ 10, citing *Ruta*, 69 Ohio St.2d at 68-69, 430 N.E.2d 935. It cannot be concluded that when construing the evidence in favor of the nonmoving party, reasonable minds can only come to one conclusion in favor of Santamaria. As a result, the trial court did not err in denying Santamaria's motion for directed verdict as it pertained to the question of liability.[3]

---

[3] In the last sentence of the appellate brief, Santamaria asks this court to find that the jury's verdict was against the weight of the evidence in the alternative to the argument regarding the motion for a directed verdict. A motion for directed verdict tests the legal sufficiency of the claim, not the weight of the evidence. *Krofta* at ¶ 10, citing *Hargrove v. Tanner*, 66 Ohio App.3d 693, 695, 586 N.E.2d 141 (1990). The single sentence raising an alternative argument structurally distinct from the sole assignment of error is insufficient to warrant further discussion. *See* App.R. 16(A)(7).

**{¶ 25}** The decision of the trial court is affirmed, and the jury's unanimous conclusion in favor of the Cleveland Clinic Foundation and Dr. Canterbury cannot be disturbed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, JUDGE

ANITA LASTER MAYS, A.J., CONCURS;
MARY EILEEN KILBANE, J., DISSENTS (WITH SEPARATE OPINION)

MARY EILEEN KILBANE, J., DISSENTING:

**{¶ 26}** I respectfully dissent from the majority opinion. I would reverse the trial court's decision denying Santamaria's motion for directed verdict upon his medical negligence claim.

**{¶ 27}** Significant evidence was presented at trial, including from defendants' own expert witness, that the TURP procedure performed by Dr. Canterbury was insufficient and ineffective. Because the evidence showed that Dr. Canterbury failed to remove all of the obstructive prostatic tissue from Santamaria's bladder, he

breached the standard of care. I acknowledge that the ultimate efficacy of the procedure is merely one factor to consider in deciding whether a physician reasonably exercised his professional judgment. However, I believe that where the procedure was wholly inadequate — resulting not only in Santamaria's continued use of a catheter and an additional surgery — it should be the primary factor in our analysis.

{¶ 28} For these reasons, I respectfully dissent.