[Cite as *Fairrow v. OhioHealth Corp.*, 2020-Ohio-5595.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ronald L. Fairrow et al., | : | |
| Plaintiffs-Appellees, | : | |
| | | No. 19AP-828 |
| v. | : | (C.P.C. No. 17CV-1898) |
| OhioHealth Corporation et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellants. | : | |

D E C I S I O N

Rendered on December 8, 2020

**On brief:** *Lamkin, Van Eman, Trimble & Dougherty, LLC, Kathy A. Dougherty*, and *Sarah A. Lodge*, for appellees. **Argued:** *Kathy A. Dougherty.*

**On brief:** *FisherBroyles, LLP, Michael R. Travern*, and *Robert B. Graziano*; *Zeiger, Tigges & Little LLP, Steven W. Tigges*, and *Ariel A. Brough*, for appellants. **Argued:** *Robert B. Graziano.*

APPEAL from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendants-appellants, OhioHealth Corporation, Megan Conrad, R.N., and Alon Geva, M.D., appeal from a judgment entered by the Franklin County Court of Common Pleas following a jury verdict in favor of plaintiffs-appellees, Ronald L. and Muriel Fairrow, on claims for medical negligence and loss of consortium. For the reasons that follow, we affirm the judgment of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On February 29, 2016, appellee Ronald Fairrow presented to Pickerington Medical Campus complaining of abdominal pain. Appellee was diagnosed with

appendicitis and referred to Riverside Methodist Hospital for a laparoscopic appendectomy. Dr. Edward Dominquez was scheduled to perform the surgery with assistance from appellant Geva, a second-year surgical resident. Appellant Conrad was the circulating nurse scheduled for the procedure. Appellee was placed under general anesthesia, and Dominquez ordered a Foley catheter placed prior to surgery. A Foley catheter is a urinary catheter that is inserted into the bladder by way of the urethra to drain urine during the procedure. It is the responsibility of the circulating nurse to place the Foley catheter and chart details of events that took place during the surgery. While Conrad did not recall if she attempted to place the catheter, she acknowledged she was likely the person that made the initial attempt. The surgical technologist, David Blevins, had a clear recollection that Conrad made the first attempt using a standard 16-French Foley catheter. According to Blevins, the first attempt to place the catheter was unsuccessful. There is testimony to support that Conrad made a second attempt to place the catheter using a larger 20-French Foley catheter but was again unsuccessful. There is a dispute of fact whether Geva or Conrad made a third attempt to place the catheter with a latex 20-French Coude catheter.

{¶ 3} It is undisputed that Conrad failed to document these attempts at catheterization. Dr. Jason Jankowski, a urologist, was consulted to place the catheter. Jankowski's operative report notes he was informed the nursing staff attempted catheterization with both a 16 and 20-French Foley catheter without success. Conrad conceded there was no reason to dispute the operative report's accuracy.

{¶ 4} Jankowski testified through videotape deposition that after entering the operating room, he conducted a physical examination of appellee. Jankowski recalled seeing blood at the meatus, the opening of the urethra, before attempting to place the catheter. According to Jankowski, he attempted to place a 20-French Coude catheter but met resistance and stopped. Jankowski, after receiving consent from appellee Muriel Fairrow, used a flexible cystoscope to observe inside appellee Ronald Fairrow's urethra. Jankowski stated the cystoscope passed atraumatically meaning he "didn't cause any trauma to the urethra." (Jankowski Dep. at 33.) In his operative note, Jankowski wrote there were "multiple false passages likely related to prior attempts at catheterization." (Feb. 29, 2016 Jankowski Operative Note, Pl.'s Trial Ex. 3.) Jankowski stated that while

there were multiple false passages, he could not say how many because "you're not going to try to go into each of these and diagnose each one for risk of causing further injury." (Jankowski Dep. at 72.)

{¶ 5} Jankowski then proceeded to use what are known as Amplatz dilators. The dilators are positioned over a guide wire and are incrementally increased in size so once the area is sufficiently dilated the catheter can be placed. Jankowski started with an 8-French dilator slowly increasing the size to avoid "trauma." (Jankowski Dep. at 79.) When Jankowski reached the 18-French dilator, he encountered resistance and stopped. Jankowski testified he then attempted to place a 16-French Foley catheter over the wire but again met resistance and stopped. Jankowski left the guide wire in place and repositioned appellee to use a rigid cystoscope. Jankowski testified he "looked and confirmed that the wire was not kinked and it still looked good." (Jankowski Dep. at 80.) Ultimately, Jankowski was able to pass and place an 18-French catheter. Dominquez completed the appendectomy without further incident. On March 1, 2016, appellee was discharged with the catheter in place. The catheter was later removed at Central Ohio Urology Group on March 4, 2016.

{¶ 6} On March 9, 2016, appellee went to Grant Medical Center for treatment after presenting with bleeding from the penis. Appellee was treated by Dr. Frederick Taylor, a urologist, who performed a cystoscopy and reinserted a Foley catheter. Taylor wrote in his operative notes, "I suspect what is happening, is that his prior false passages from the attempts at Foley catheter placement had undermined the urethra and were causing some bleeding from the corpus spongiosum. There was no real brisk bleeding from this area but definitely a diffuse ooze again from, what appeared to be, the prior false passages." (Mar. 9, 2016 Taylor Operative Note, Pl.'s Trial Ex. 2A.)

{¶ 7} On March 13, 2016, appellee returned to Grant Medical Center with additional bleeding from the penis. Taylor performed another cystoscopy on March 14, 2016. Taylor wrote in his operative notes, "[t]here was one [false passage] at the 3 o'clock position that was relatively easy to control with a cautery loop but then a 2nd much larger false passage that is more ventral really at the 6 or 7 o'clock position tunnels deep underneath the urethra towards the prostate gland and there is really copious bleeding coming from this area." (Mar. 14, 2016 Taylor Operative Note, Pl.'s Trial Ex. 2A.)

Jankowski later stated in his deposition that these false passages were in the same position in the urethra as the ones he observed when he did the cystoscope on February 29. Appellee developed stricture requiring a suprapubic catheter, placed through an incision into his abdomen, to drain his bladder. Appellee had multiple procedures over the next eight months and ultimately required a urethroplasty, a surgical procedure to reconstruct the urethra, on November 30, 2016.

{¶ 8} On February 23, 2017, appellee filed a complaint for medical negligence and res ipsa loquitor. Appellee Muriel Fairrow also filed a claim for loss of consortium. Appellants filed an answer on September 5, 2017. After extensive discovery, this matter was set for a jury trial. A series of pretrial motions were filed by the parties. Relevant to this appeal, on February 12, 2019, appellees filed a motion in limine to prohibit appellants from apportioning fault to Jankowski arguing that since no expert testified Jankowski deviated from the standard of care, apportionment would be improper. Appellants filed a memorandum in opposition arguing the jury should resolve the apportionment issue because Jankowski made a catheter attempt before observing the false passages and used Amplatz dilators that could have caused appellee's injuries. The trial court agreed with appellees and did not permit the jury to consider the apportionment issue. Appellants were able to make the argument at trial that Jankowski was the cause of appellee's injuries.

{¶ 9} Appellants also filed a motion in limine to preclude testimony that Conrad's failure to document prior attempts at catheterization constituted a deviation from the standard of care. Appellants argued there was no evidence that this failure to document caused any harm to appellee. Appellees contended the information was highly relevant and if excluded would encourage medical providers to not chart adverse events to escape liability. The trial court agreed with appellees and denied the motion.

{¶ 10} On February 25, 2019, the parties tried the case to a jury. At the close of appellees' case, appellants moved for a directed verdict on several grounds. First, appellants argued there was insufficient evidence presented at trial to demonstrate there was a deviation from the standard of care and insufficient evidence appellants were the cause of appellee's injuries. Appellants also moved for a directed verdict on the negligence claim regarding Conrad's failure to document the prior attempts at catheterization. Appellants argued there was no evidence Conrad's failure to document the catheterization

attempts caused any harm to appellee since Jankowski was informed of the prior attempts to place the catheter. The trial court denied appellants' motion for a directed verdict on the negligence claim as to standard of care and causation but did grant appellants' motion on the documentation issue. The trial court concluded there was no causation testimony connecting Conrad's failure to document prior attempts at catheterization to appellee's injuries.

{¶ 11} Both parties proposed jury instructions and interrogatories for consideration. Relevant to this appeal, appellants proposed an interrogatory for the jury to consider apportioning liability against Jankowski. Appellees proposed an interrogatory allowing the jury to consider whether appellee's injuries constituted permanent and substantial deformity under R.C. 2323.43(A)(3). The trial court allowed the damages interrogatory but denied appellants' request for the apportionment interrogatory.

{¶ 12} On March 1, 2019, the jury rendered a verdict in favor of appellees and against appellants for medical negligence. The jury determined appellee Ronald Fairrow's injuries resulted in a permanent and substantial physical deformity awarding $256,000 in economic damages and $1,206,250 in noneconomic damages, totaling $1,462,250. Appellee Muriel Fairrow was awarded $250,000 in loss of consortium. On March 13, 2019, the trial court filed its judgment entry reducing the noneconomic damages to the statutory cap of $500,000 modifying appellees' total damages to $1,006,000.

{¶ 13} On April 10, 2019, appellants filed a combined motion for judgment notwithstanding the verdict and, alternatively, motion for a new trial. The trial court denied appellants' motions on June 12, 2019.

{¶ 14} Appellants filed a timely appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 15} Appellants assign the following as trial court error:

> [1.] The Trial Court Erred in Denying Appellants' Motions for Directed Verdict and JNOV/New Trial Because Appellees Failed to Introduce Sufficient Evidence that There Was a Deviation From the Standard of Care Since There Was No Evidence the False Passages First Seen by Dr. Jankowski Were More than "Trivial."

> [2.] The Trial Court Erred in Denying Appellants' Motions for Directed Verdict and JNOV/New Trial Because Appellees Lacked Causation Expert Testimony.

[3.] The Trial Court Erred in Rejecting Appellants' Submission of an Interrogatory Allowing the Jury to Apportion Liability to Dr. Jankowski.

[4.] The Trial Court Erred in Allowing the Jury to Hear Evidence and Testimony that the Lack of Catheter Documentation by Nurse Conrad Was a Deviation from the Standard of Care.

[5.] The Trial Court Erred in Permitting Jury Interrogatory No. 4 Related to the Higher Cap on Noneconomic Damages Found in R.C. 2323.43(A)(3).

## III. LEGAL ANALYSIS

### A. Appellants' First Assignment of Error

{¶ 16} In their first assignment of error, appellants argue the trial court erred in denying their motions for a directed verdict, judgment notwithstanding the verdict, and new trial as appellees failed to introduce sufficient evidence that appellants deviated from the standard of care. Specifically, appellants argue appellees failed to meet their burden "because they failed to demonstrate that Mr. Fairrow's injury at the time of Dr. Jankowski's observation of 'multiple false passages' was anything more than trivial." (Appellants' Brief at 28.) For the reasons that follow, we disagree.

{¶ 17} When reviewing a motion for directed verdict, the court must consider the evidence most strongly in favor of the nonmoving party. Civ.R. 50(A). "A motion for a directed verdict raises questions of law, not factual issues, because it tests whether the evidence is legally sufficient to allow the case to be presented to the jury for deliberation." *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 37 (10th Dist.), citing *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679-80 (1998). The court's consideration of the motion does not involve weighing of the evidence or credibility of the witness. *Reeves* at ¶ 37, citing *Texler* at 679-80. " 'The court must deny the motion where any evidence of substantial probative value favors the nonmoving party and reasonable minds might reach different conclusions on that evidence.' " *Father's House Internatl., Inc. v. Kurguz*, 10th Dist. No. 15AP-1046, 2016-Ohio-5945, ¶ 36, quoting *Reeves* at ¶ 37. Accordingly, we review the trial court's ruling on a motion for a directed verdict de novo. *Father's House Internatl.* at ¶ 36.

{¶ 18} A motion for a judgment notwithstanding the verdict under Civ.R. 50(B) is to resolve whether the evidence presented is totally insufficient to support the verdict. *Gilson*

*v. Am. Inst. of Alternative Medicine*, 10th Dist. No. 15AP-548, 2016-Ohio-1324, ¶ 94, citing *Harper v. Lefkowitz*, 10th Dist. No. 09AP-1090, 2010-Ohio-6527, ¶ 8. A successful motion for a judgment notwithstanding the verdict " 'is not easily obtained.' " *Smith v. Superior Prod., LLC*, 10th Dist. No. 13AP-690, 2014-Ohio-1961, ¶ 11, quoting *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986). Civ.R. 50(B) states:

> (1) Whether or not a motion to direct a verdict has been made or overruled a party may serve a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion * * *.
>
> * * *
>
> (3) If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence. If no verdict was returned the court may direct the entry of judgment or may order a new trial.

{¶ 19} The test utilized by a trial court when determining a motion for judgment notwithstanding the verdict is the same as the one applied in a motion for a directed verdict. *Father's House Internatl.* at ¶ 41, citing *Gilson* at ¶ 94, citing *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275 (1976). " 'Neither the weight of the evidence nor the credibility of the witnesses is a proper consideration for the court. If there is evidence to support the non-moving party's side so that reasonable minds could reach different conclusions, the court may not usurp the jury's function and the motion must be denied.' " *Weller v. Price*, 10th Dist. No. 18AP-264, 2020-Ohio-2735, ¶ 13, quoting *Jeffrey v. Marietta Mem. Hosp.*, 10th Dist. No. 11AP-492, 2013-Ohio-1055, ¶ 23. Appellate review of a trial court's ruling on a motion for judgment notwithstanding the verdict is de novo.

{¶ 20} We review motions for a new trial based on a judgment that is contrary to law, pursuant to Civ.R. 59(A)(7), de novo as they represent questions of law. *Ball v. Stark*, 10th Dist. No. 11AP-177, 2013-Ohio-106, ¶ 15, citing *Rohde v. Farmer*, 23 Ohio St.2d 82 (1970), paragraph two of the syllabus. Pursuant to Civ.R. 59(A)(9), appellate review of a motion for a new trial based on an error of law is also reviewed de novo. *Sully v. Joyce*, 10th Dist. No. 10AP-1148, 2011-Ohio-3825, ¶ 8, citing *Ferguson v. Dyer*, 149 Ohio App.3d 380, 383 (2002).

{¶ 21} In order to demonstrate a claim for medical negligence, a plaintiff must establish: "(1) the standard of care recognized by the medical specialty community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained." *Grieser v. Janis*, 10th Dist. 17AP-3, 2017-Ohio-8896, ¶ 17, citing *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-999, 2013-Ohio-5140, ¶ 19, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130 (1976). In *Bruni*, the Supreme Court of Ohio established the legal standard for medical negligence stating:

> In evaluating the conduct of a physician and surgeon charged with malpractice, the test is whether the physician, in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations.

*Id.* at 129-30.

{¶ 22} In a medical malpractice case, the plaintiff bears the burden to establish sufficient evidence to allow the trier of fact to conclude the defendant breached the requisite standard of care. *Foy v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 16AP-723, 2017-Ohio-1065, ¶ 25, citing *Gordon v. Ohio State Univ.*, 10th Dist. No. 10AP-1058, 2011-Ohio-5057, ¶ 77. A deviation from a standard of care must be established through expert testimony. *Grieser* at ¶ 18, quoting *Ramage v. Cent. Ohio Emergency Servs., Inc.*, 64 Ohio St.3d 97, 102 (1992). Expert testimony that fails to establish the recognized standard of care is fatal to demonstrating a prima facie case of medical negligence. *Grieser* at ¶ 18, quoting *Bruni*.

{¶ 23} As stated previously, Jankowski's operative notes indicate he was informed there were at least two attempts to place the catheter without success. Jankowski also testified to seeing blood at the meatus during his physical examination. Jankowski then attempted to place a catheter but met resistance and stopped. Jankowski proceeded to use a flexible cystoscope to observe inside appellee's urethra where he noted "multiple false passages likely related to prior attempts at catheterization." (Feb. 29, 2016 Jankowski

Operative Note, Pl.'s Trial Ex. 3.)  Jankowski defined false passages as a deviation into the tissue outside the lumen.  Jankowski testified:

> A:  The situation I encountered, there were false passages and difficulty identifying the true lumen.
>
> Q:  All right. Are you able to say based on the other situations that you've had where there have been false passages, have the patients gone on to experience continuing difficulties from that or do those normally heal?
>
> A:  Some have.
>
> Q: Okay.  And have some gone on to have urethral reconstruction?
>
> A:  Yes.

 (Jankowski Dep. at 87.)

{¶ 24} In his March 14, 2016 operative report, Taylor described the location and severity of bleeding from the false passages, writing "[t]here was one [false passage] at the 3 o'clock position that was relatively easy to control with a cautery loop but then a 2nd much larger false passage that is more ventral really at the 6 or 7 o'clock position tunnels deep underneath the urethra towards the prostate gland and there is really copious bleeding coming from this area."  (Mar. 14, 2016 Taylor Operative Note, Pl.'s Trial Ex. 2A.) Jankowski later testified the false passages he visualized were in the same position in the urethra as the false passages later identified by Taylor when appellee presented at Grant Medical Center for emergency treatment.  Jankowski explained in his deposition that he did not try to analyze the false passages because "you're not going to try to go into each of these and diagnose each one for risk of causing further injury."  (Jankowski Dep. at 72.)

{¶ 25} Appellees called Dr. Jonathan Vapnek as their expert in this case.  Vapnek testified he is a board-certified physician specializing in urology at Mt. Sinai Medical Center in New York.  Vapnek has practiced medicine for over 25 years and spends at least 75 percent of this time in the active clinical practice of medicine.  Vapnek testified he has performed catheterizations and is familiar with the various types of catheters at issue.  Prior to his testimony, Vapnek reviewed the medical records related to appellee as well as relevant deposition testimony.  According to Vapnek, catheters cause "false passages, the vast majority, 99 plus percent of false passages * * *.  And that's a catheter that doesn't make the turn properly and dives right into this corpus spongiosum."  (Tr. Vol. III at 325.)

Vapnek testified when there are multiple false passages, it is more difficult to place the catheter.

{¶ 26} Vapnek testified he was familiar with the standard of care for placing of a Foley catheter in a male patient and, based on a reasonable degree of medical probability, Conrad "did not meet the standard of care when she placed the catheter because she caused trauma and caused the false passage." (Tr. Vol. III at 339-40.) Vapnek also testified "Geva as well violated the standard of care by using too much force and causing false passage and damaging the urethra." (Tr. Vol. III at 340.) Vapnek explained his conclusions as follows:

> So the basis is that if you try to pass a catheter correctly, meaning with just the right amount of mild pressure, you're not going to cause a false passage. When you've created a false passage, it means that you've pushed too hard, and that is basically how false passages occur. They occur when catheters are placed incorrectly.

(Tr. Vol. III at 340.)

{¶ 27} Conversely, appellants presented expert testimony from Dr. James Donovan. Donovan testified he is a board-certified urologist employed at the University of Cincinnati at the College of Medicine. Donovan has practiced for over 32 years and devotes at least 75 percent of his professional time to the active clinical practice of medicine or its teaching. As for appellee's injuries, Donovan stated appellee suffered a traumatic catheterization but stated that a catheter could not penetrate into the spongiosum. Donovan did concede that excessive force can cause false passages. Donovan testified that based on the timeline of events, it could not be determined which of the three catheter attempts caused the false passages stating "it's impossible to know which one, if--well, we don't say which one, if any. I mean, it happened. But it's, I don't think, possible to attribute it to any of the catheters. More likely you can attribute it to all of the attempts that stopped when resistance was met." (Tr. Vol. IV at 675.)

{¶ 28} When asked about Donovan's anticipated testimony that catheters could not cause this type of injury, Vapnek disagreed stating "false passages by their very nature are caused by catheter trauma. That's where false passages come from." (Tr. Vol. III at 344.) Jankowski also testified "[i]n practicing urology I've seen in numerous cases where nurses attempted catheterization and caused false passages." (Jankowski Dep. at 85.)

{¶ 29} Testimony from appellants on their attempts at catheterization offered little probative value. Conrad could not recall anything related to the catheter attempts but testified as to her normal habit and routine when placing a catheter. Geva similarly could not recall how many attempts he made to place the catheter. The only testimony on appellants' attempts at catheterization came from Blevins, the surgical technologist, who testified Conrad attempted the catherization and there was a "struggle[]" to place the catheter. (Tr. Vol. IV at 815.)

{¶ 30} In the present case, Vapnek testified that, within a reasonable degree of medical probability, Conrad and Geva deviated from the applicable standard of care by using excessive force when placing the catheters causing appellee's injuries. When reviewing a motion for a directed verdict in a medical malpractice case, once an expert has testified as to " 'his professional opinion to a properly formed question as to "probability," he * * * has established a prima facie case as a matter of law.' " *Grieser*, 2017-Ohio-8896, at ¶ 36, quoting *Heath v. Teich*, 10th Dist. No. 03AP-1100, 2004-Ohio-3389, ¶ 14, quoting *Galletti v. Burns Internatl.*, 74 Ohio App.3d 680, 684 (11th Dist.1991). We have previously found even the " ' "[e]rosion of [an expert] opinion due to effective cross-examination does not negate that opinion; rather it only goes to weight and credibility." ' " *Grieser* at ¶ 36, quoting *Heath* at ¶ 14, quoting *Galletti* at 684. The exception is when the witness's testimony on cross-examination forces the expert witness to directly contradict, negate, or recant the previous testimony on direct examination. *Grieser* at ¶ 36, citing *Heath* at ¶ 14. "If no such contradiction, negation, or recantation is shown, the testimony given on cross-examination only arouses speculation regarding the witness's testimony on direct and leaves a question of fact for the jury to determine." *Heath* at ¶ 14, citing *Nichols v. Hanzel*, 110 Ohio App.3d 591, 602 (4th Dist.1996), citing *Shapiro v. Burkons*, 62 Ohio App.2d 73, 83-84 (8th Dist.1978); *see also Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 182 Ohio App.3d 768, 2009-Ohio-2460, ¶ 18 (9th Dist.) (concluding conflicting opinions by expert physicians "may have affected the weight and credibility of his opinions, but did not, alone, serve to recant his prior testimony").

{¶ 31} Here, appellees have presented expert opinion that appellants deviated from the standard of care and caused appellee Ronald Fairrow's injuries. While Vapnek conceded that a scrape and bruising was not enough to show a deviation from the standard

of care, he testified appellants did, in fact, deviate from the standard of care. As such, appellees have presented evidence through medical records and testimony that, if believed, a jury could reasonably infer the false passages in this case were more than trivial. While Donovan's testimony could be interpreted to conflict with Vapnek's opinion, Donovan's testimony and appellants' cross-examination of Vapnek go towards the weight and credibility of those witnesses.

{¶ 32} Appellants argue that while Vapnek testified there was a deviation from the standard of care, his testimony was not based on the evidence since the testimony presented stated the injuries were merely irregular. Whether appellees have met their burden demonstrating standard of care comes down to the competing testimony of the witnesses. Vapnek testified to reviewing appellee's medical records from three different hospitals, emergency squad reports, behavioral health records, and the deposition transcripts from appellees, Jankowski, Donovan, Geva, and Blevins. Based on his professional experience and review of the above documents, Vapnek testified appellants deviated from the standard of care when trying to place the catheter. Based on our review of the record, we have no reason to believe that Vapnek's professional opinion was not adequately based on the evidence at trial. While Donovan testified that catheters do not cause this type of injury and do not penetrate into the spongiosum, the jury was free to weigh the evidence and give more credibility as they deemed appropriate.

{¶ 33} As such, the trial court did not err in finding that based on the medical records and the testimony of the experts, if believed, provided sufficient evidence the injuries were more than trivial, and appellants' treatment was a deviation from the standard of care. Further, the trial court did not err in denying appellants' motions for judgment notwithstanding the verdict and a new trial as the evidence was not totally insufficient or contrary to law to support the verdict.

{¶ 34} Accordingly, we overrule appellants' first assignment of error.

### B. Appellants' Second Assignment of Error

{¶ 35} In their second assignment of error, appellants allege the trial court erred in denying its motion for a directed verdict, motion for judgment notwithstanding the verdict, and motion for a new trial because appellees failed to demonstrate the element of causation. Appellants allege there was insufficient testimony that established the false passages

observed by Jankowski were "the same as the injuries observed by Dr. Taylor which necessitated Mr. Fairrow's urethroplasty." (Appellants' Brief at 35.)

{¶ 36} The standards of review for a directed verdict, judgment notwithstanding the verdict, and motion for a new trial are set forth in our discussion of Assignment of Error 1.

{¶ 37} After a review of the record, we conclude appellees presented enough evidence of causation that, if believed, was sufficient to present to the jury for consideration. Appellees addressed causation using several witnesses at trial. First, Jankowski wrote in his operative notes to visualizing "multiple false passages likely related to prior attempts at catherization." (Feb. 29, 2016 Jankowski Operative Note, Pl.'s Trial Ex. 3.) On March 14, 2016, Taylor wrote in his operative notes "[t]here were several false passages that were created in the initial attempts of placing the Foley catheter at that time." (Mar. 14, 2016 Taylor Operative Note, Pl.'s Trial Ex. 2A.) Taylor noted the false passages were located at the 3 o'clock position and the 6 or 7 o'clock position. Jankowski testified the false passages noted by Taylor were in the same location as the ones he identified on February 29, 2016. Vapnek also testified, within a reasonable degree of medical probability, the false passages identified by Taylor in his operative report were related to the false passages noted by Jankowski stating "[t]hese are one in the same." (Tr. Vol. III at 376.) When asked at trial his basis for concluding the areas noted by Taylor in his operative report are related to the false passages noted by Jankowski, Vapnek responded:

> A: Again, we know that when Dr. Jankowski got to the operating room and did his flexible cystoscopy on February 29th, he identified at least two false passages, and here we are two weeks later and we're dealing with the same problem.
>
> Q: All right.
>
> A: It just has not healed. They're that severe.

(Tr. Vol. III at 376.)

{¶ 38} Appellees elicited extensive testimony from Vapnek concerning the cause for the false passages. When Vapnek was asked whether appellee's false passages would have been present before entering the operating room, he responded "[a]bsolutely not." (Tr. Vol. III at 336.) Vapnek explained "[f]alse passages are caused by instrumentation, and the vast majority are caused by catheterization. So these--Mr. Fairrow did not have these when he was put to sleep. He had these when--by the time Dr. Jankowski scoped him, they were

there."  (Tr. Vol. III at 336.)  Finally, Vapnek testified, within a reasonable degree of medical probability, Geva and Conrad breached their standard of care trying to place the catheter, which caused appellee's injuries.

{¶ 39}  As set forth previously, when considering a motion for a directed verdict in a medical malpractice case, once an expert has stated his professional opinion to a properly formed question regarding probability, it has established a prima facie case as a matter of law.  *Grieser*, 2017-Ohio-8896, at ¶ 36; *see also Heath*, 2004-Ohio-3389, at ¶ 9, citing *Stinson v. England*, 69 Ohio St.3d 451 (1994), paragraph one of the syllabus ("Expert testimony with respect to proximate cause must be stated in terms of probability.").  Here, Vapnek testified, within a reasonable degree of medical probability, appellants caused the false passages by applying too much force when attempting to place the catheter.

{¶ 40}  Appellants primarily argued at trial that it was Jankowski, not appellants, that caused appellee's injury.  The jury heard expert testimony from both parties on this issue.  Concerning Jankowski's attempt at placing the catheter, Vapnek testified "[Jankowski], with his urological expertise, took a Coude catheter, gently passed it into the urethra to get a feel for where the resistance was.  And when he realized that this catheter was not going to go in, he appropriately called for the cystoscope and did a flexible cystoscopy to basically figure out what had happened during those first attempts prior to Dr. Jankowski coming to the operating room."  (Tr. Vol. III at 329.)  Vapnek continued, stating Jankowski's use of the flexible cystoscope "actually figur[ed] out exactly what the problem was."  (Tr. Vol. III at 336.)  As for causation, Vapnek testified he believed Jankowski did not cause appellee's injuries:

> * * * Dr. Jankowski did what he was supposed to do which means he knew there was trouble.  He took the Coude catheter.  He lubricated it.  He pushed it in gently to find out where the resistance would be because he knew that at least two, if not three, attempts had been made prior to his coming to the operating room.  And then when he found that there was resistance, instead of continuing to push and make a problematic situation worse, he backed the catheter out and called for the cystoscope.

(Tr. Vol. III at 343.)

{¶ 41}  Appellants also argue the Amplatz dilators, not the catheters, caused appellee's injuries.  Donovan testified:

> [B]ased upon the geometry, that the catheters couldn't do it, didn't get there, and that the -- one of the Amplatz dilators -- and I don't believe it would be the tiny ones that just go over the wire.  It was either the 16 or the 17 that would have the force -- I mean, the rigidity and the ability to cut in and make a false passage, a fairly large one.

(Tr. Vol. IV at 706.)

{¶ 42} While Donovan stated the Amplatz dilators could have gone off track and the wire was out of the bladder, he conceded there was no evidence in Jankowski's notes the wire from the Amplatz dilators was not in the bladder or off track.  Donovan also acknowledged that a urologist is more proficient in placing a catheter than a surgical resident.

{¶ 43} Once again, the expert opinions were at odds as Vapnek strongly contested the Amplatz dilators caused the false passages.  Vapnek testified there was no indication the guide wire was out of place at any point in the procedure.  Vapnek noted that it was important Jankowski used the fluoroscopy to confirm it was in the bladder because it was not easy to see where the lumen of the urethra was located.  Vapnek testified the Amplatz dilators could not have made the false passages worse stating:

> A:  The Amplatz dilators are going over the wire, and that wire is going from the urethra into the bladder.  So the only thing that can happen with an Amplatz dilator is that if it's not making the turn, it may buckle, but you're still in the urethra. You're not in the false passage.  The false passages are off to the side, below and off to the side. That wire is keeping the Amplatz dilator on track.
>
> * * *
>
> Q: Is there any evidence in Dr. Jankowski's note or his deposition testimony that that wire was misplaced at any time?
>
> A: Not at all.  And that wire--he was able to use that wire all the way to the very end when he put the Councill catheter in, so that wire was nice and straight.

(Tr. Vol. III at 353-54.)

{¶ 44} As was the case with the first assignment of error, appellees have presented qualified expert testimony, if believed, demonstrating the element of causation.  Vapnek, after reviewing the medical records and relevant trial documentation, concluded that based

on a reasonable degree of medical probability, appellants caused appellee's injuries when attempting to place the catheters. Donovan, while maintaining that Jankowski did not deviate from the standard of care, posited the Amplatz dilators could have caused appellee's injuries, not the attempts at catheterization. Again, while appellants have presented testimony that could be viewed as conflicting evidence, it is the province of the jury to resolve this issue. As such, we conclude there was sufficient evidence presented by appellee. Further, the trial court did not err in denying appellants' motion for judgment notwithstanding the verdict and new trial as the evidence was not totally insufficient or contrary to law to support the verdict.

{¶ 45} Accordingly, appellants' second assignment of error is overruled.

### C. Appellants' Third Assignment of Error

{¶ 46} In their third assignment of error, appellants allege the trial court erred in rejecting their submission of an interrogatory allowing the jury to consider apportioning liability to Jankowski. We disagree.

{¶ 47} "Jury interrogatories serve the purpose of 'test[ing] the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial.' " *Whitmer v. Zochowski*, 10th Dist. No. 15AP-52, 2016-Ohio-4764, ¶ 94, quoting *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.*, 28 Ohio St.3d 333, 336-37 (1986). The trial court is tasked with controlling the substance and form of jury interrogatories and may reject proposed interrogatories that are deemed "ambiguous, confusing, redundant, or otherwise legally objectionable." *Whitmer* at ¶ 96, citing *Ramage*, 64 Ohio St.3d at 107-08. As such, a reviewing court considers the trial court's decision whether to submit a proposed interrogatory to a jury under an abuse of discretion standard. *Whitmer* at ¶ 96, citing *Freeman v. Norfolk & W. Ry. Co.*, 69 Ohio St.3d 611, 614 (1994). Abuse of discretion is more than an error of law but implies that the trial court's ruling was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive." (Emphasis sic.) *AAAA Ents., Inc. v. Ricer Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 48} To include a jury interrogatory on apportionment, appellants must demonstrate evidence of tortious conduct. *See* R.C. 2307.23(A).

> For purposes of [apportionment to non-parties], it is an affirmative defense for each party to the tort action from whom the plaintiff seeks recovery in this action that a specific percentage of the tortious conduct that proximately caused the injury or loss to person or property or the wrongful death is attributable to one or more persons from whom the plaintiff does not seek recovery in this action. Any party to the tort action from whom the plaintiff seeks recovery in this action may raise an affirmative defense under this division at any time before the trial of the action.

R.C. 2307.23(C).

{¶ 49} The trial court denied appellants' request for an apportionment interrogatory reasoning there was no expert witness willing to testify that Jankowski deviated from the standard of care. Vapnek addressed Jankowski's treatment during direct examination:

> Q: All right. And you were asked some questions about Dr. Jankowski's use of the word "gentle." And are there other reasons that you have for saying that Dr. Jankowski was not negligent in his attempts to place the 20-French Coude?
>
> A: Yes.
>
> Q: What are those?
>
> A: Well, number one, he is a urologist who's in a better position to feel what the urethra feels like when he's trying pass a catheter, and secondly, when he goes in to do the cystoscope right afterwards, he finds that there are multiple false passages there.

(Tr. Vol. III at 509.)

{¶ 50} While Donovan, appellants' expert, testified there is no way to know which of the three or four initial catheter attempts caused injury to appellee, he made it very clear that Jankowski did not fall below the standard of care in his treatment of appellee. When asked by appellees "you're not saying Dr. Jankowski fell below the standard of care in any manner, correct," Donovan responded "[c]orrect." (Tr. Vol. IV at 741.) When asked whether Donovan was critical of Jankowski for trying to use the Amplatz dilators when the patient was in the supine position, he responded "I think it's possible to, in some cases, do

that safely, but the -- I'm not -- I'm not here to be critical of Dr. Jankowski, frankly."  (Tr. Vol. IV at 757.)  Donovan was then asked:

> Q.  Doctor, that's not the point here.  You've already told us that * * * Dr. Jankowski did me[e]t the standard of care, right?
>
> A.  I'm not saying that [Jankowki's use of the Amplatz dilators] is below the standard of care.

(Tr Vol. IV. at 771.)

{¶ 51} Appellants argue because "the trial court's failure to include the apportionment interrogatory, the jury was foreclosed from deliberating on whether Dr. Jankowski—who inserted a catheter—was one of the individuals who 'failed to use ordinary care by forceful[ly] insert[ing]' a catheter."  (Appellants' Reply Brief at 14.)  While the trial court did not allow the jury to consider an interrogatory addressing apportionment, appellants used considerable time at trial arguing Jankowski, not appellants, caused appellee's injuries.  The jury was free to consider those arguments in resolving the medical negligence claims against appellants.  Ultimately, the jury determined "Ohio Health [sic] failed to use ordinary care by forceful insertion of a urinary catheter."  (Mar. 4, 2019 Jury Interrog. No. 2.)  Further, in response to Interrogatory No. 3, "[d]o you find by a preponderance of the evidence that OhioHealth Corporation's negligence was a direct and proximate cause of Ronald Fairrow's injuries," the jury answered "[y]es."  (Mar. 4, 2019 Jury Interrog. No. 3.)  As such, the jury expressly concluded that appellants, not Jankowski, failed to use ordinary care and were the cause of appellee's injuries.

{¶ 52} Accordingly, given the lack of expert testimony that Jankowski was negligent, we find the trial court did not act unreasonable, arbitrary, or unconscionable.  Vapnek testified that Jankowski was not negligent when attempting to place the catheter and stated there was no evidence the wire for the Amplatz dilators was misplaced.  Donovan declined to state Jankowski deviated from the standard of care when attempting catheterization and testified he was not critical of Jankowski for trying to use the Amplatz dilators when the patient was in the supine position.  After a review of the transcript, the trial court appeared concerned that there was no evidentiary basis without expert testimony to pose the apportionment question to the jury.[1]  Under the abuse of discretion standard, we find the

---

[1] *See* Tr. Vol. V at 902-04; Jun. 12, 2019 Decision & Entry.

trial court's application of R.C. 2307.23 was reasonable given the evidence presented at trial.

{¶ 53} As such, appellants' third assignment of error is overruled.

**D. Appellants' Fourth Assignment of Error**

{¶ 54} In their fourth assignment of error, appellants argue the trial court erroneously denied their motion in limine to preclude testimony that Conrad's failure to document prior catheterization attempts constituted a deviation from the standard of care. Appellants contend that because there was no evidence Conrad's failure to document attempts at placing the catheter proximately caused any harm to appellee, the testimony was inflammatory and prejudicial.

{¶ 55} "A motion in limine is a request ' "that the court limit or exclude use of evidence which the movant believes to be improper, and is made in advance of the actual presentation of the evidence to the trier of fact, usually prior to trial." ' " *Sanders v. Fridd*, 10th Dist. No. 12AP-688, 2013-Ohio-4338, ¶ 44, quoting *Gordon*, 2011-Ohio-5057, at ¶ 82, quoting *State v. Winston*, 71 Ohio App.3d 154, 158 (2d Dist.1991). Determination of admission or exclusion of evidence is within the sound discretion of the trial court. *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20, citing *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). "Thus, because a trial court's decision on a motion in limine is a ruling to admit or exclude evidence, our standard of review on appeal is whether the trial court committed an abuse of discretion that amounted to prejudicial error." *Sanders* at ¶ 45, citing *Gordon* at ¶ 82.

{¶ 56} In the present case, the trial court noted several bases for denying the motion in limine. First, the trial court appeared concerned with the fairness of excluding evidence of credibility when Conrad was to testify as to her habit and routine. The trial court reasoned:

> I would think that the standard of care would involve complying with the necessity of documenting what you do, and that she did not do that would be evidence that she was not using the usual habits that she would use when she's in the operating room.
>
> So I don't know that I would say that you could -- can she say this is what I usually do, but then all of a sudden, wow, she's wide open to but you didn't even document any of this. And that's a part of the standard of care.

(Pretrial Tr. at 21-22.)

{¶ 57} The trial court also noted excluding testimony that Conrad deviated from the standard of care would have precluded evidence that nurses are required to document catheterization attempts, which would in effect incentivize medical professionals to not document these actions in the future. The trial court noted its concern that precluding testimony addressing the standard of care sends the wrong message to the medical community stating:

> Whether or not there's actually a proximate cause or not-- because I agree with and, frankly, I like the argument that to hold otherwise, to basically not get into the documentation issue at all, is simply to -- that doesn't -- that sends the wrong message out to the medical community.

> So she can come in and testify to her habit, but she's absolutely fair game on not meeting the standard of care, whether it's documenting or whether it's on that particular day.

(Pretrial Tr. at 24-25.)

{¶ 58} Finally, while subsequently resolved through the crafting of a jury interrogatory, the trial court also reasoned inclusion of the documentation issue was relevant to determine whether Geva or Conrad was negligent. Appellees anticipated presenting evidence at trial that would show Conrad and/or Geva attempted to place appellee's catheter. While these attempts were verbally conveyed to Jankowski, there is no documentation as to who made the attempts. Neither Conrad nor Geva recalled attempting to insert the catheter. The trial court noted that there could be an issue with the jury finding the catheterization attempts were negligent but not being able to determine which appellant was negligent. This issue was ultimately resolved with the trial court crafting an interrogatory, which stated "[d]o you find by a preponderance of evidence that OhioHealth Corporation was negligent in its care and treatment of Ronald Fairrow?" (Mar. 4, 2019 Jury Interrog. No. 1.) Given the interrogatory consolidated review of each appellant, the jury no longer had to determine negligence of one individual but against OhioHealth.

{¶ 59} Based on the trial court's extensive explanation for including testimony regarding Conrad's deviation from the standard of care by failing to document the catheterization attempts, we find the trial court did not abuse its discretion. Appellants argue there were two separate events, documentation and insertion of the catheter, and

appellees could have asked Conrad questions about lack of documentation to attack her credibility without getting into the ultimate legal issue of a deviation from the standard of care. We disagree. Given the timeline of events, Conrad's credibility played a significant role in her testimony as to the catherization procedure. If appellants were able to elicit testimony on Conrad's habit of placing a Foley catheter, it was only equitable to allow testimony regarding the standard of care as it relates to the lack of documentation. As the trial court stated, "this is absolutely fair game." (Pretrial Tr. at 24.)

{¶ 60} Moreover, the trial court remediated any potential prejudice from the documentation testimony. At the close of appellees' case, the trial court granted appellants' motion for directed verdict for negligence as it concerned Conrad's failure to document the failed attempts at catheterization. The trial court also provided clarifying information for the jury as to the claim of negligence. During deliberations, the jury submitted the following question to the court: "Does lack of documentation constitute negligence in this case by law?" (Tr. Vol. V at 1084.) The trial court responded:

> Answer: No. It does not relate to any claim relating to the placement of catheters. Any lack of documentation is relevant only if you find negligence and proximate cause by a preponderance of evidence, and are otherwise not able to determine which of OhioHealth Corp., Inc.'s employees committed it.

(Jury Questions: Question One, filed Nov. 20, 2019.)

{¶ 61} The record reflects counsel for both parties agreed this was an acceptable response. The jury ultimately understood the trial court's guidance as evidenced by their response to the negligence interrogatory, writing "Ohio Health [sic] failed to use ordinary care by forceful insertion of a urinary catheter." (Mar. 4, 2019 Jury Interrog. No. 2.)

{¶ 62} Accordingly, the trial court did not abuse its discretion allowing testimony that Conrad's failure to document prior attempts at catheterization constituted a deviation from the standard of care. The trial court also remediated any potential prejudice by granting appellants' motion for a directed verdict on the documentation issue and providing clarifying information to the jury.

{¶ 63} Accordingly, appellants' fourth assignment of error is overruled.

**E. Appellants' Fifth Assignment of Error**

{¶ 64} In their fifth assignment of error, appellants argue the trial court erred in allowing the jury to consider an interrogatory that addressed the higher cap on noneconomic damages. Appellants argue there was insufficient objective evidence presented at trial that appellee suffered a permanent and substantial deformity as stated in R.C. 2323.43(A)(3). For the reasons that follow, we disagree.

{¶ 65} A trial court's inclusion of a jury interrogatory is reviewed under an abuse of discretion standard. *Whitmer*, 2016-Ohio-4764, at ¶ 96, citing *Freeman*, 69 Ohio St.3d at 614.

{¶ 66} Pursuant to R.C. 2323.43, a plaintiff's noneconomic damages in a medical-malpractice action is subject to two levels of statutory caps. The first noneconomic damages cap "is the larger of $250,000 or three times the economic damages, subject to a maximum of $350,000 per plaintiff and a maximum of $500,000 per occurrence." *Guiliani v. Shehata*, 1st Dist. No. C-130837, 2014-Ohio-4240, ¶ 17, citing R.C. 2323.43(A)(2). The statute allows for a second higher cap of $500,000 per plaintiff and $1,000,000 per occurrence if the plaintiff has sustained an injury deemed a "[p]ermanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system." R.C. 2323.43(A)(3)(a). There is no dispute that appellee did not lose the use of a limb or lose the use of a bodily organ system. Accordingly, our analysis will focus on whether appellee's injuries constitute a permanent and substantial deformity.

{¶ 67} The term "permanent and substantial physical deformity" is not statutorily defined. *Torres v. Concrete Designs, Inc.*, 8th Dist. No. 105833, 2019-Ohio-1342, ¶ 77. Consequently, Ohio and federal courts alike have had to consider whether an injury constitutes a permanent and substantial deformity based on the particular facts of the case. Generally, courts have considered " 'any "permanent and substantial physical deformity" must be "severe and objective." ' " *Id.*, quoting *Sheffer v. Novartis Pharmaceuticals Corp.*, S.D.Ohio No. 3:12-cv-238 (July 15, 2014), quoting *Weldon v. Presley*, N.D.Ohio No. 1:10 CV 1077 (Aug. 9, 2011). The higher statutory cap is reserved for "catastrophic injuries." *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, ¶ 60.

{¶ 68} The trial court must determine whether there is enough evidence to meet the basic evidentiary threshold. Once that threshold is met, it is for the trier of fact, not the

court, to determine whether the damages constitute permanent and substantial deformity. *See Ohle v. DJO, Inc.*, N.D.Ohio No. 1:09-cv-02794 (Sept. 28, 2012) *(*finding the jury was best positioned to resolve whether scarring, removal of a portion of a bone, and loss of cartilage constituted a permanent and substantial deformity). In *Arbino*, the Supreme Court discussed the role of the trier of fact in determining the nature and extent of a plaintiff's damages. The *Arbino* court wrote a trial court must not " 'impose its own factual determination regarding what a proper award might be.' " *Id.* at ¶ 41, quoting *Estate of Sisk v. Manzanares*, 270 F.Supp.2d 1265, 1277-78 (D.Kan.2003).

{¶ 69} Once the Ohio General Assembly enacted the noneconomic damages cap, the Ohio Judicial Conference republished the Ohio Pattern Jury Instructions ("OJI") so jurors must determine whether the plaintiff's injuries constitute permanent and substantial physical deformity. *Guiliani* at ¶ 24, citing *Ohle*; *see also* OJI-Civil 315.01(6). "Thus, O.J.I. 'supported having the jury, and not the judge, decide the issue of the nature of a plaintiff's injury.' " *Guiliani* at ¶ 24, quoting *Ohle*; *see also Bransteter v. Moore*, N.D.Ohio No. 3:09 CV 2 (Jan. 21, 2009) (finding whether a perforated bowel and surgical scar constituted a substantial and permanent deformity should be determined by the jury).

{¶ 70} Appellants argue appellees failed to demonstrate the injuries sustained from the failed catherization attempts were permanent and substantial deformities. Specifically, appellants contend there was a lack of objective evidence presented for the trial court to allow the jury to consider the higher noneconomic cap.

{¶ 71} In the instant case, the evidence at trial showed appellee suffered several serious injuries as a result of the failed attempts at catherization. Over 8 months, appellee endured 12 different procedures including cystoscopies, catheterizations, and a suprapubic catheter placed in his abdomen. Appellee's injuries ultimately required a urethroplasty. Appellee testified that as a result of the surgery, he has "a pretty long scar in my -- on my testicles" as well as a scar from the suprapubic catheter, which he described as a "scar and a little bit of a hole." (Tr. Vol. III at 557, 558.) Appellee characterized the change in his penis as "[s]ubstantially shorter" and described a reduced function in maintaining an erection. (Tr. Vol. III at 559.) Appellee Muriel Fairrow confirmed her husband's injuries as well and stated the intimacy of their relationship has been greatly affected.

{¶ 72} Vapnek testified as to the result of a urethroplasty on the anatomy of the penis. Vapnek stated:

> [Y]ou now have a gap of somewhere between 2 and 4 centimeters, and you have to -- again, without tension, you have to pull them together. But the problem is that you're missing at least an inch, and that shortens things.
>
> And this is one of the things that is unfortunate about doing urethroplasties, is that the penis is typically shortened when a piece of urethra is taken out.

(Tr. Vol. III at 398-99.)

{¶ 73} In this case, the medical records from Dr. Christopher McClung, the surgeon that performed the urethroplasty, indicate that 4.5 centimeters of urethra was removed during the procedure. While appellants argue the pathology report only says 2 centimeters in length were removed, Vapnek explains "when you cut something out, it has a tendency to retract. So it may have been 4 centimeters at the time, and by the time it gets put in formalin and sent down to the lab, it shrunk." (Tr. Vol. III at 398.)

{¶ 74} Appellants contend appellees were required to provide additional objective evidence, i.e. photographs, to meet the evidentiary threshold. We find this argument unpersuasive. While more evidence concerning the nature of an injury is generally beneficial, the trial court felt the testimony of appellees and Vapnek was sufficient to allow the jury to consider whether the injuries constituted a permanent and substantial deformity. Given the nature of the injuries and sensitivity associated with the location of the scarring, the trial court's judgment was not unreasonable, arbitrary, or unconscionable. Further, the use of a photograph to demonstrate the reduced size of the penis after the injury would have little value given there were no photographs of the area prior to the injuries.

{¶ 75} Appellants argued McClung could have testified as to the length of appellee's penis before and after the procedure. We find this argument to be without merit. The nature of the injury is not so complicated that appellees cannot testify from their own personal knowledge. "[M]atters of common knowledge and experience, subjects which are within the ordinary, common and general knowledge and experience of mankind, need not be established by expert opinion testimony." *Ramage*, 64 Ohio St.3d at 103. Appellants

have presented no evidence to contradict appellees' claims or cause the trial court to question appellees' characterization of the injuries.

{¶ 76} Appellants rely on *Weldon* for the proposition that appellee's scarring does not amount to a severe disfigurement. While we acknowledge there are inconsistencies amongst the federal cases when reviewing whether injuries constitute a substantial and permanent deformity, we find *Weldon* distinguishable from the present case. In *Weldon*, the plaintiff brought a personal injury claim in federal court originating out of an automobile accident. The *Weldon* court found a four-centimeter scar did not constitute permanent and substantial injuries. Here, unlike *Weldon*, appellee described not only severe scarring along his scrotum and stomach but a reduction in the size of his penis. Given the distinct nature of the scarring as well as additional harm suffered by appellee, we find *Weldon* inapplicable to the present case.

{¶ 77} Moreover, both Ohio and federal courts have found scarring, and other analogous injuries, serious enough for the jury to consider whether the injury constituted permanent and substantial deformity. *See Torres*, 2019-Ohio-1342, at ¶ 75 (allowing the jury to consider whether a "healed" facial scar constituted permanent and substantial deformity); *Cawley v. Eastman Outdoors, Inc.*, N.D.Ohio No. 1:14-CV-00310 (Oct. 17, 2014) (finding that a scar on a hand, and other external and internal deformities, were sufficient for the jury to consider the severity of the deformity); *see also Swartz v. E.I. du Pont de Nemours & Co.* (In re E.I. du Pont de Nemours & Co. C-8 Pers., Litig.), S.D.Ohio No. 2:18-cv-136 (June 17, 2019) (determining the removal of a third of the plaintiff's kidney and removal of major organ tissues could constitute permanent and substantial injury); *Ross v. Home Depot USA Inc.*, S.D.Ohio No. 2:12-cv-743 (Sept. 23, 2014) (finding misshapen, distorted conditions in a knee and shoulder sufficient evidence to reach the jury).

{¶ 78} Based on the forgoing, the trial court did not abuse its discretion allowing the jury to consider whether appellee's injuries constituted a permanent and substantial deformity.

{¶ 79} Accordingly, appellants' fifth assignment of error is overruled.

## IV.  CONCLUSION

{¶ 80} Having overruled appellants' five assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and DORRIAN, JJ., concur.

_____